**Reverse and Render; Opinion Filed August 19, 2014.**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00104-CV

## THOMPSON & KNIGHT LLP, Appellant
## V.
## PATRIOT EXPLORATION, LLC AND PATRIOT LAND, LLC D/B/A JF PATRIOT LAND, LLC, Appellees

On Appeal from the 68th Judicial District Court
Dallas County, Texas
Trial Court Cause No. 11-07174

### OPINION
Before Justices Moseley, Francis, and Lang
Opinion by Justice Moseley

This is a legal malpractice case. The client, Patriot[1] (plaintiff/appellee) alleged that its former law firm, Thompson & Knight (T&K) (defendant/appellant), failed to discover a gap in legal title to its oil and gas working interests. Rectifying that gap in title delayed Patriot from selling those interests by five months according to Patriot. Patriot eventually sold its interests in September 2008 for $5.5 million. However, Patriot asserted it would have obtained a sales price $960,000 higher five months earlier, as the spot market price for natural gas was higher at that time.

After reaching a partial settlement, Patriot and T&K agreed to a bench trial on whether

---

[1] We refer to appellants Patriot Exploration, LLC and Patriot Land, LLC d/b/a JF Patriot Land, LLC collectively as Patriot.

Patriot was entitled to recover economic damages based on its claim; for purposes of that bench trial T&K stipulated to liability. The trial court found for Patriot and rendered judgment for $960,000 against T&K.

We conclude the expert's opinion on damages is based on invalid assumptions and constitutes legally insufficient evidence of damages. We also conclude there is no evidence the buyer of the interests would have paid more for the interests in April than it did in September. Thus, there is no evidence T&K's negligence proximately caused any damages. Accordingly, we reverse the trial court's judgment and render judgment that Patriot take nothing from T&K.

## BACKGROUND

T&K represented Patriot in part of a complex oil and gas transaction involving Eastern Shelf Partners, LLC, a related company, MexTex Operating Company, and Apollo Resources International, Inc. Eastern Shelf and MexTex controlled the rights to develop and operate oil and gas leases (Leases) covering several thousand acres of property northwest of San Antonio. In 2006, Eastern Shelf and Apollo Resources entered into an Acquisition Agreement whereby Apollo Resources acquired the Leases from Eastern Shelf (with Eastern Shelf retaining a ten percent working interest) in exchange for funding the drilling of hundreds of wells on the property. Eastern Shelf and Apollo Resources agreed to engage MexTex as the operator of the Leases.

Apollo Resources later assigned some of its rights and obligations under the Acquisition Agreement to Patriot. Eastern Shelf, MexTex, Apollo Resources, and Patriot entered into an omnibus agreement confirming Patriot's participation in the project. Patriot and Apollo Resources formed a partnership to own, operate, maintain, and dispose of Apollo Resource's interests in the Leases. Patriot entered into a participation agreement with Apollo Resources to provide $5 million to drill twelve wells on acreage located in Sutton County, Texas (a portion of

–2–

the land covered by the Leases). Ultimately, Patriot drilled only nine of the planned wells, at a cost of $5.4 million. Of those nine wells, three were dry holes and three others were not economic and were shut in. The three producing wells did not meet the production specifications in the partnership agreement and the partnership dissolved by its terms effective January 31, 2008.

Anticipating the drilling operations would not meet the partnership agreement's production specifications, in 2007 Patriot began taking steps to liquidate the partnership assets. In late August 2007, however, Patriot learned the recorded assignments from Eastern Shelf had not been to Apollo Resources but to its subsidiary, Apollo Natural Gas Company, LLC. As a result, there was a gap in title to the property Apollo Resources had purportedly assigned to the partnership formed with Patriot. The parties refer to this title problem as the Title Gap.

When it learned of the Title Gap, T&K drafted corrected assignments between Eastern Shelf and Apollo Natural Gas, but Apollo Natural Gas never executed the assignments. T&K terminated its representation due to the conflict of interest with Patriot and Patriot retained attorney Dick Watt to cure the Title Gap.

On behalf of Patriot, Watt filed suit in Sutton County against Apollo Resources, Apollo Natural Gas, Eastern Shelf, MexTex, and a party who claimed a lien for work performed on some of the wells. Patriot sought declaratory and other relief, including an order compelling Apollo Natural Gas to assign the Leases to Patriot; Patriot also sought to remove MexTex as operator of the Leases.

The court in Sutton County rendered a default judgment against Apollo Resources and Apollo Natural Gas on May 8, 2008. The default judgment ordered Apollo Natural Gas to assign the Leases to Patriot and declared that Patriot was the owner of those properties. The Sutton County trial court severed the default judgment from the remaining claims against Eastern Shelf,

MexTex, and the other party, and the default judgment became final on July 7, 2008. The effect of this final judgment was to remedy the Title Gap.

In June 2008, Patriot (through Watt) negotiated with MexTex (the operator) and Eastern Shelf (the other working interest owner) about liquidating the assets of Patriot's partnership with Apollo Resources and settling the remaining parts of the Sutton County lawsuit. They entered into a letter agreement dated September 18, 2008 whereby Patriot agreed to sell MexTex all of its existing interest in the assets of the partnership (including the wells and the Leases) and in the various agreements (collectively the Patriot Interests) for $5.5 million. Patriot also agreed to cause the release of funds held in suspense by purchasers of production to MexTex. Patriot, MexTex, and Eastern Shelf agreed to dismiss the remaining portion of the Sutton County lawsuit with prejudice on the closing date of the purchase.

After Patriot concluded the transactions called for by the September 18, 2008 letter agreement, it filed this suit against T&K for legal malpractice. Eventually Patriot and T&K reached a partial settlement. As a part of that settlement, the parties agreed to a bench trial on Patriot's claim that the Title Gap prevented it from selling the Patriot Interests on April 1, 2008 for a price higher than it received from MexTex in September. T&K stipulated to liability for purposes of that trial, but contested Patriot's right to recover any economic damages.

Patriot's expert, Gregory Scheig, testified he prepared an economic model for arriving at the $5.5 million amount that MexTex paid for the Patriot Interests in September 2008. He then applied that same model to a hypothetical April 1, 2008 sale—with adjustments for a decline in the spot market and future prices of natural gas and for a five-month delay in drilling and other development activities. (In doing so Scheig assumed Patriot had a potential buyer for the April 1 date.) Based on this analysis, he concluded the delay and reductions in natural gas prices resulted in "reduced sale proceeds to Patriot compared to what they would have been expected to

receive in April 1, 2008." The amount of that reduction was (rounded) $960,000.

The trial court rendered judgment awarding Patriot economic damages in the amount of $960,000. The trial court also signed findings of fact and conclusions of law. Those findings challenged by T&K[2] on appeal are summarized as follows:

- T&K's negligence proximately caused injury to Patriot resulting in damages;

- Scheig's [Patriot's expert's] damage calculation of $960,000 is supported by a preponderance of the evidence and is a reasonable approximation of damages proximately caused by T&K's negligence;

- the delay in Patriot's ability to sell the Patriot Interests resulted in damages of $960,000;

- MexTex was not the only potential buyer for the Patriot Interests from April to September 2008;

- MexTex or another potential buyer would have paid Scheig's April 1, 2008 estimated sale price for the Patriot Interests in an April 1, 2008 sale; and

- MexTex, its lender, or another potential buyer used or would have used Scheig's assumptions to value the Patriot Interests in September 2008.

In three issues, T&K contends there is no evidence of any prospective purchaser other than MexTex for an April 1, 2008 purchase and no evidence MexTex would have paid more in April than it actually paid in September; Scheig's opinion on damages is based on invalid assumptions and constitutes no evidence; and Scheig used the wrong date for a hypothetical sale because the Title Gap was cured in May rather than July 2008.

### STANDARD OF REVIEW

Findings of fact in a nonjury trial have the same force and dignity as a jury's verdict and may be reviewed for legal and factual sufficiency under the same standards. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam); *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 912 (Tex. App.—Dallas 2008, no pet.). In a bench trial, the trial court is the sole judge of the credibility of the witnesses and may believe one witness over another and resolve any conflicts

---

[2] T&K challenged other findings but they are not necessary to resolve this appeal.

or inconsistencies in the testimony. *Shaw v. County of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied). A party appealing from a nonjury trial in which the trial court made findings of fact and conclusions of law should direct his attack on the sufficiency of the evidence at specific findings of facts, rather than at the judgment as a whole. *See Shaw*, 251 S.W.3d at 169; *Fiduciary Mortg. Co. v. City Nat. Bank of Irving*, 762 S.W.2d 196, 204 (Tex. App.—Dallas 1988, writ denied).

In reviewing a legal sufficiency challenge to the evidence, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A legal sufficiency challenge "will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Kroger Tex., Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

An expert's opinion that is speculative or conclusory or assumes facts contrary to evidence in the record is legally insufficient. *See, Arkoma Basin Exploration Co. v. FMF Associates 1990-A, Ltd.*, 249 S.W.3d 380, 388–89 (Tex. 2008). In conducting our sufficiency review, we cannot ignore contrary evidence showing an expert's opinion has no scientific basis or evidence showing the expert's assumptions are unfounded. *See City of Keller*, 168 S.W.3d at

813. The standards we follow in considering the sufficiency of expert opinions are:

> "Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence," and we have "often held that such conclusory testimony cannot support a judgment." "A conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment." Further, "a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." Expert testimony fails if there is "simply too great an analytical gap between the data and the opinion proffered." Courts are not required "to ignore fatal gaps in an expert's analysis or assertions."

*Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013) (citations omitted).

## ANALYSIS

To prevail on a legal malpractice claim, the plaintiff must prove the defendant owed the plaintiff a duty, the defendant breached that duty, the breach proximately caused the plaintiff's injury, and the plaintiff suffered damages. *Akin, Gump*, 299 S.W.3d at 112; *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995). Breach of the standard of care and causation are separate inquiries, and an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other. *Alexander v. Turtur & Associates, Inc.*, 146 S.W.3d 113, 119 (Tex. 2004). Thus, even when negligence is admitted, causation is not presumed. *Haynes & Boone v. Bowser Bouldin Ltd.*, 896 S.W.2d 179, 181–82 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45–46 (Tex. 2007).

The general measure of damages in a legal malpractice case is the difference between the amount the plaintiff probably would have recovered in the absence of malpractice, and the amount recovered. *Elizondo*, 415 S.W.3d at 270. This case, however, does not involve malpractice in the handling of litigation and the measure of damages may be generalized to the difference between the result obtained for the client and the result that would have been obtained but for the attorney's negligence. *See id.* at 263.

*Elizondo* was a malpractice suit alleging the attorney obtained an inadequate settlement for the plaintiffs in a mass tort lawsuit. *Elizondo*, 415 S.W.3d at 261. The supreme court

recognized that evidence of actual damages may not raise a fact issue as to malpractice damages: "The two are not the same here, because the case settled for $50,000. Even if the Elizondos suffered some compensable damages, they suffered as a result of the Attorneys' conduct only if, absent malpractice, they probably would have recovered a settlement for more than $50,000." *Id.* at 270. This case is similar in that Patriot received $5.5 million from MexTex for the sale of the Patriot Interests and the settlement of the Sutton County litigation. It suffered malpractice damages only if, absent malpractice, it probably would have received more in an earlier transaction.

The record does not contain direct evidence of any buyer other than MexTex, which was the operator of the Leases, and Patriot conceded at oral argument that MexTex was the only buyer for the Patriot Interests. Therefore, we conclude there is no evidence to support the portions of the trial court's findings that MexTex was not the only potential buyer for the Patriot Interests, another potential buyer would have paid Scheig's April 1, 2008 estimated sale price, and another potential buyer would have used Scheig's assumptions to value the interests in September 2008. Thus, whether Patriot would have received more for the leases but for T&K's malpractice boils down to whether there is any evidence that MexTex would have paid more for the Patriot Interests in April than it paid in September. And specifically, that it would have paid the amount calculated by Scheig in a hypothetical April 1, 2008 sale.

## A. Expert Opinion

We first consider T&K's second issue, in which it argues Scheig's expert opinion regarding damages is legally insufficient to support the judgment. In making that argument, T&K attacks the assumptions supporting Scheig's reports and his testimony.

T&K attacks the model created by Scheig relating the September 18, 2008 transaction between MexTex and Patriot to NYMEX futures prices on that date. T&K argues MexTex did

not use that method to determine the price it offered Patriot and there is no evidence to support Scheig's fundamental assumptions underlying the April 1, 2008 valuation. T&K contends Scheig merely assumed that the September 2008 price reflected MexTex's estimate of the discounted present value of future production from existing wells and wells to be drilled in the future.

The record reflects Scheig assumed the $5.5 million received by Patriot for the September 18, 2008 transaction was a simple asset sale. In fact, he testified he was unaware MexTex's purchase from Patriot was in connection with the settlement of a lawsuit that, according to Patriot's attorney Watt, was "strangling" MexTex because production runs had been suspended and MexTex was incurring operating expenses without getting revenue from production. In addition to transferring the title to the Patriot Interests, the settlement also disposed of the claims between the parties and allowed MexTex to receive the funds held in suspense. This aspect of the September transaction would have been missing from a hypothetical sales transaction in April, but Scheig did not account for that difference in his analysis. In fact, Scheig did not know what effect Patriot's suit against MexTex had on the price MexTex was willing to pay to get the properties and get out of the lawsuit.

T&K also argues Scheig's assumptions about future production and drilling costs were incorrect. Scheig's method required that he project the amount, timing, and costs of future natural gas production from the properties. For the amount of production and the costs, rather than using the information from Patriot's actual 2007 experiences, Scheig used estimates and projections in an October 2006 reserve economic analysis prepared by Patriot's in-house petroleum engineer, Carter Henson. Based on Henson's report, which was prepared before Patriot entered into the transaction, Scheig assumed (among other things): (1) to develop the properties the operator would drill 60 wells; (2) over a twenty–year lifetime, each of the 60 wells

would have average estimated ultimate recovery of 260,000 Mcf of gas; (3) drilling and completing each well would cost an estimated $425,000, and operating each well would cost an estimated $1,100 per month.[3]

In contrast, of the nine wells Patriot actually drilled in 2007,[4] none of them had an estimated ultimate recovery of 260,000 Mcf, which was the average used by Henson and by Scheig in his model. As T&K points out, three of the nine wells were dry holes, three did not produce economically viable quantities and were shut in, and Scheig admitted the other three would not produce the 260,000 Mcf as estimated by Henson. Nevertheless, Scheig's reports and his testimony relied on Henson's 2006 production estimates and rejected this actual data.

Patriot argues that Wiggins's testimony he believed the results of future wells "will be different" in a positive way, supports Scheig's assumption that future wells would meet Henson's 2006 projections. We disagree. Scheig did not rely on Wiggins's lay opinion as to future drilling results. Further, Wiggins's testimony about different results and having learned something from Patriot's wells was vague and conclusory. Testimony that future wells would be different in a positive way is not evidence those wells would produce the average 260,000 Mcf over twenty years as projected by Henson.[5]

Further, as T&K points out, Patriot's actual drilling costs were higher than the estimates used by Henson, and thus used by Scheig as well. Rather than the $425,000 costs per well for drilling and completion hypothesized by Henson and used by Scheig, it is undisputed that Patriot invested $5.4 million in the nine wells it drilled in 2007, amounting to $600,000 per well.

---

[3] T&K argues that Henson's assumptions may have been reasonable in 2006, but they were not reasonable when Scheig prepared his report.

[4] Patriot only drilled nine of the twelve wells it contracted to drill.

[5] Patriot also points to Wiggins's testimony that Eastern Shelf in the 2006 transaction projected that drilling costs would be approximately $425,000 a well. But that estimate suffers the same problems as Henson's projections: they were both done before Patriot's actual drilling.

A buyer—in April or September 2008—would have had Patriot's actual drilling experience, both the production results and costs incurred, available. Certainly MexTex as operator had that information on both dates. There is nothing to support Scheig's assumption that a buyer—be it MexTex or anyone else—would have ignored that information and instead utilized a prospective analysis from the year before drilling had begun.

T&K argues there is no evidence MexTex planned to drill 60 wells beginning in October 2008. We agree. Scheig's analysis had to account for when and how fast the properties would be developed, as this impacted the estimated date and amount of gas production as well as the present value of the anticipated income resulting from that production. Scheig assumed the property would be drilled at the rate of two wells per month (per Henson's report), and that development would begin the month after the transaction closed. In other words, he assumed that when MexTex paid the $5.5 million it anticipated it would begin drilling in October 2008, and that the buyer in the hypothetical April transaction would have anticipated drilling in May.

But there is no evidence MexTex (or any other prospective buyer) expected or planned to drill sixty wells at the rate of two wells per month beginning immediately after the purchase—whether it took place in April or in September. Significantly, as of the time Scheig testified at trial—four years after the September 2008 settlement—none of the 60 wells anticipated by Scheig and by Henson's 2006 report had been drilled.[6]

Scheig's other assumptions are also troublesome. As T&K argues, Scheig merely assumed his discounted cash flow method was sufficient to explain MexTex's September offer to acquire the Patriot Interests and settle the Sutton County litigation for $5.5 million.[7] To do that,

_____

[6] Further, the record indicates the sale to MexTex did not actually close until November 18, 2008; Scheig doesn't explain why, in light of that closing date, it is likely MexTex planned to begin drilling new wells in October and priced its offer accordingly.

[7] T&K explains that Patriot's claim is for the alleged loss of an "unique bundle of interests in South Texas

Scheig adjusted his model's discount rate for proven undeveloped reserves (needed to determine the present value of the future estimated cash flow from the as-yet undeveloped production) so the model would yield a result equal to the $5.5 million Patriot received in September.[8] He then used that model to project what MexTex (or another hypothetical buyer) should have been willing to offer for the Patriot Interests in April. However, as T&K points out, Mark Wiggins, who was a principal of both MexTex and Eastern Shelf, testified he did not rely on a reserve economic analysis in making the September offer and that he did not go through any reserve economic analysis based on gas prices to arrive at the $5.5 million amount.

Patriot disputes Wiggins's testimony, asserting MexTex had a reserve analysis from Eastern Shelf's purchase of the Leases in 2006. We agree, however, with T&K that possessing such an analysis is not inconsistent with Wiggins's testimony that he did not use it as a basis for MexTex's September offer. Moreover, the Eastern Shelf analysis is not in the record and Scheig did not review it or rely on it for his conclusions. And it is axiomatic the Eastern Shelf analysis from the 2006 transaction would not have included data based on Patriot's actual experience in developing the properties in 2007.

Patriot posits that Scheig's opinion still supports an award of damages without the assumption that MexTex would drill 60 wells. Patriot points to Scheig's opinion in a supplemental report.[9] To avoid the sixty-well assumption, Scheig simply divided the $5.5

---

real property, not a sale of fungible commodities in a[n] economically-efficient market."

[8] In other words, rather than multiply future estimated income by a market-based discount rate to determine the present value of that income, Scheig hypothesized the discount rate necessary to make his model yield the desired result: $5.5 million in September 2008. He then used that same discount rate in calculating the present value of the production from proven undeveloped wells had the operator began drilling the month after the April hypothetical transaction. In his supplemental report, Scheig referred to a survey from the Society of Petroleum Evaluation Engineers that indicated an average discount rate of 15.3% was used for valuing oil and gas properties in 2008.

[9] Scheig also performed similar discounted cash flow calculations based on the same production and cost assumptions, but using different discount rates. These calculations resulted in amounts similar to his initial report.

million actual price by the spot market price for natural gas on September 18, 2008. He then took the result, multiplied it by the higher spot market price on April 1, 2008, and concluded the difference between the result and the $5.5 million represented the "Reduction in Sale Price due to Delayed Sale." He concluded Patriot's economic damages using this method were $875,000.

This, of course, is nothing more than a calculation of the volume of natural gas that $5.5 million would have bought on the spot market in September 2008, approximately 665,860 Mcf. Scheig then took this hypothetical volume of gas and calculated how much that volume would have sold for at the higher spot market price on April 1, 2008. In essence, Scheig assumed the Patriot Interests were equivalent to a pool of natural gas ready to be marketed instantly. Thus, he equated the property to a volume of natural gas that could be priced solely on spot market prices on a given date.

This assumption ignores the actual transaction involved in this case: a transfer of ownership of working interests in largely undeveloped mineral leases covering thousands acres of land.[10] Patriot did not sell and MexTex did not buy 665,860 Mcf of readily marketable natural gas in September, nor was that amount of readily marketable natural gas available to be sold in April. Rather, Patriot sold and MexTex bought working interests in mineral leases covering thousands of acres of land, most of which were undeveloped, i.e., they were not producing natural gas.

We can analogize to the requirement to prove collectability in suit-within-a-suit malpractice cases. In those cases, not only must the plaintiff prove the amount of the judgment it

---

[10] In the supplemental report, Scheig compared the share prices of a publicly traded energy company with the spot market prices of gas for 2007 and part of 2008. He found the share prices tended to rise and fall as spot market prices rose and fell. He also found a correlation between the spot prices and the share prices, indicating that 85% of the change in the share prices during this time period is explained by the change in natural gas prices. However, this analysis again ignores the actual transaction at issue in this case. This case does not involve the transfer for shares of stock on public markets nor the sale of natural gas on the spot market. Nothing but Scheig's naked assumption equates those property interests with the property interests involved in this case.

–13–

would have obtained, it must also show how much, if any, of that judgment it would have collected from the defendant. *Akin Gump*, 299 S.W.3d at 114–15 ("But collectability must be proved; it is not presumed."). Here, Scheig provided a value for the property as of April 1, 2008, but there is no evidence MexTex or anyone else would have actually paid that amount for the property. In other words, there is no evidence that Patriot would have collected that amount from a buyer but for T&K's negligence. *See Elizondo*, 415 S.W.3d at 270 (client damaged only if she would have recovered more in a settlement without the attorney's negligence).

"When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995); *see also Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009) (courts are to "rigorously examine the validity of facts and assumptions on which [expert] testimony is based"); *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 804 (Tex. 2006). We conclude the assumptions on which Scheig's opinion is based vary materially from the actual, undisputed facts of the case, and thus his testimony and reports are legally insufficient to support the damage award.

## B. Would a Buyer Pay More?

We next consider T&K's first issue: whether there is legally sufficient evidence that MexTex would have paid more for the properties in April than it did in September. Patriot's principal, Jonathan Feldman, testified Watt cured the Title Gap and negotiated the sale of the Patriot Interests to MexTex in the September 18, 2008 letter agreement. Watt testified about his efforts to settle the Sutton County litigation and negotiate with MexTex for documents and information necessary to sell Patriot's interests. Watt solicited an offer from MexTex to buy the Patriot Interests. This eventually resulted in the September 18, 2008 letter agreement for MexTex to purchase the Patriot Interests and to settle the Sutton County lawsuit. Watt did not

testify about whether MexTex would have paid more for the Patriot Interests in April than it agreed to pay in September.

Scheig was instructed to assume Patriot had a buyer in April and therefore offered no expert opinion that MexTex or any other person would have paid a higher price in April. He confirmed at trial that he was instructed to assume that hypothetically the Patriot Interests could have been sold on April 1, 2008.

The only other witness was Mark Wiggins, who was a principal of both MexTex and Eastern Shelf.[11] In contrast to Patriot's witnesses, Wiggins testified MexTex would not have paid more for the property in April than it did in September:

> Q. Now, let's go back to April of 2008. Would you have paid MexTex -- would MexTex have paid any more money for the property in April of 2008 than it did in September of 2008?
>
> A. No, sir.

After cross-examination, Wiggins confirmed his testimony:

> Q. Okay. And is it still correct, after all these questions from Mr. Tobey, that in April of 2008 at any time thereafter would you have ever offered any more money than that?
>
> A. No, sir.
>
> Q. 5.5 was it whether it was April or September.
>
> A. Yes, sir.

The trial court asked Wiggins how MexTex came up with the $5.5 million price for the Patriot Interests. Wiggins explained:

> The interest that was involved, it was the larger interest that came to Patriot by virtue of Apollo's default, so it was 60-something wells. I don't know the exact number but more than 60 and several thousand acres involved that we had to take a look at to see if -- where was our position. We were the operator. We were a 10 percent owner. Here was an opportunity to buy, you know, the rest of the interest, the balance of the interest in the entire the property. And again, the starting point

---

[11] Wiggins signed the instruments involved in this case on behalf of both entities.

was the understanding or the impression that [Patriot] wouldn't take less than what he had in it, so if we're gonna start the process, the offer would be what we knew to be approximately what he had in it.

The trial court then questioned Wiggins about whether MexTex would have paid $5.5 million if all nine of the Patriot wells had been dry holes or if gas prices dropped 90 percent. Wiggins responded that MexTex probably would have because of its perception of the value of the balance of the properties. If prices fell, he did not know how that would affect their financing capability, "but our appraisal started with, can we afford to pay $5 1/2 million for this group of properties? We weren't tested on an upper limit, but that's what we offered, and that's what was accepted." MexTex made the offer and Patriot accepted it; there was no counter-offer from Patriot. The court asked if MexTex would have paid more if there had been a longer negotiation. Wiggins responded, "I can't address what we might have done."

Asked if the price of gas had nothing to do with the price MexTex agreed to pay for the Patriot Interests, Wiggins responded:

No, sir. I can't say that it didn't -- it had nothing to do, but in the context of the overall picture of these properties and our relative ownership and what we thought our opportunities in the future were going to be, we weren't really gearing it on what we're saying price of the product was necessarily gonna be. We felt like it would be adequate.

T&K argues there is no reasonable basis for disregarding the direct testimony of Wiggins, a disinterested witness in this case, that MexTex would not have paid more for the properties in April 2008 than it did in September of that year. Patriot counters that the trial court had good reason to discredit Wiggins's testimony.

Patriot argues the trial court was free to disbelieve Wiggins's testimony, and contends that the price of natural gas on the spot market is always an important factor in oil and gas assignments. Scheig testified that in his experience in other oil and gas assignments, the price of

natural gas is always an important factor.[12] But merely because spot market prices may be an important factor, does not necessarily mean a buyer will also pay more for producing and undeveloped oil and gas leases. Wiggins's testimony shows he considered other factors both when Eastern Shelf purchased the Leases in 2006 and when MexTex purchased the Patriot Interests in September 2008. (Wiggins explained that when Eastern Shelf purchased the property in 2006, it had an economic reserve analysis from some source, but the offer to the seller was based on "what we knew they'd been offered previously, so there were factors other than just the pricing of reserves.")

In particular, Patriot claims Wiggins was not truthful about whether MexTex used a reserve analysis when it made the $5.5 million offer to Patriot. Specifically, Patriot points to the Wiggins's testimony Eastern Shelf probably looked at or obtained a reserve analysis in connection with its purchases of the Leases in 2006 and that MexTex had that economic reserve analysis. From this evidence, Patriot argues the trial court could have inferred that MexTex relied on the Eastern Shelf reserve analysis when it agreed to pay $5.5 million for Patriot's interest in September 2008.

The problem is that the Eastern Shelf reserve analysis is not in evidence and is not in the record. There is no evidence about what conclusions were stated in or what prices were used for that analysis. Thus it is mere speculation what the 2006 Eastern Shelf reserve economic analysis showed. Even so, MexTex had that same reserve analysis in April of 2008 and there is nothing in the record to indicate that MexTex would have paid more in April based on the same economic reserve analysis that it had in September when it paid only $5.5 million.

Patriot does not explain how having a reserve analysis is inconsistent with Wiggins's

---

[12] According to Scheig, spot prices for natural gas available to market where $8.26 per Mcf on September 18, 2008 and $9.92 per Mcf on April 1, 2008.

testimony that MexTex's offer to Patriot was based on what Patriot had invested in the property. Nor does Patriot explain how MexTex's possession in 2008 of an Eastern Shelf analysis prepared in 2006 is evidence MexTex would have paid more for the property in April 2008 than it did in September 2008, when it still had the same analysis. And it is no evidence MexTex used Scheig's assumptions in September 2008 or that it would have paid Scheig's estimate sales price in April 2008.

Patriot next argues the trial court could have inferred MexTex would have paid more for the property in September 2008 because Wiggins testified they were not "tested on an upper limit" and he would not say that gas prices had nothing to do with the September offer. Patriot asserts this inference is also supported by Wiggins's testimony about the financing of the $5.5 million purchase price. But as Wiggins explained, he was aware of gas prices but he looked at factors other than price in purchasing the interest and was not basing his offer on what the price of the product was going to be. Wiggins explained the lender performed its own due diligence, obtained personal guaranties from Wiggins and other individuals, and was satisfied with lending the $5.5 million purchase price in September 2008. Patriot argues the trial court could have inferred from Wiggins's testimony that banks typically lend 60 to 70% of the present value of a property, that the lender valued the property at over $9 million in September 2008. However, Wiggins refused to testify that the bank valued the property at close to $10 million: "Q. Okay. So they thought this property was probably worth close to $10 million? A. I can't say that and I won't."

But an inference that MexTex might have paid more for the property in September or that its lender appraised the property at more than the September purchase price, says nothing about the critical fact issue in the case: would MexTex have paid more for the Patriot Interests in April 2008 than it paid in September 2008. There is no evidence in the record that MexTex or anyone

else offered to buy the Patriot Interests for more than $5.5 million. Nor is there any evidence of what a lender valued the property at in April 2008.

The flaw in Patriot's analysis is that it relies on meager circumstantial evidence to draw inferences from other inferences. As stated in Patriot's brief:

> [Wiggins's testimony] that he could "not address" what MexTex "might have done" if Patriot had demanded more money supported the inference that MexTex would have paid more in September. And if MexTex would have paid more in September, with the price of natural gas trending downward, the trial court surely could have inferred that it also would have paid more in April, when the price was rising.

But it is equally reasonable to infer from Wiggins's testimony about the September offer that MexTex would not have paid more. His refusal to speculate on what MexTex might have done does not give rise to a reasonable inference that MexTex would have paid more—it merely invites more speculation. Evidence that is so weak as to do no more than create a mere surmise or suspicion of its existence is, in legal effect, no evidence. *See Akin, Gump¸* 299 S.W.3d at 115; *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.").

Furthermore, "an inference stacked only on other inferences is not legally sufficient evidence." *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003) (citing *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001)). "'[S]ome suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.'" *Id*. (quoting *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 210 (Tex. 2002) (quoting *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 & n.3 (Tex. 1993)). On this record, the fact finder would have to guess from the circumstances whether MexTex would have paid more for the property in April than it paid in September. *See City of Keller*, 168 S.W.3d at 813 (meager circumstantial evidence is legally insufficient if jurors would have to guess whether a vital fact exists).

Finally, even if the trial court did not to believe Wiggins's testimony, discredited evidence is not affirmative evidence that MexTex or any other buyer would have paid more for the properties in April. "When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Mathis v. Lockwood*, 166 S.W.3d 743, 745 (Tex. 2005) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984)). Thus, even if the trial court discredited Wiggins's testimony, Patriot can point to no other evidence in the record to show that MexTex would have paid more in April of 2008.

### CONCLUSION

We conclude Scheig's expert opinion on damages is based on invalid assumptions and constitutes legally insufficient evidence of damages. We also conclude there is no evidence the buyer of the interests would have paid more for the interests in April than it did in September. Thus, there is no evidence T&K's negligence proximately caused any damages. We sustain T&K's first and second issues. We need not address the other issue. TEX. R. APP. P. 47.1.

We reverse the trial court's judgment and render judgment that Patriot take nothing from T&K.

/Jim Moseley/
JIM MOSELEY
JUSTICE

130104F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THOMPSON & KNIGHT LLP, Appellant

No. 05-13-00104-CV      V.

PATRIOT EXPLORATION, LLC AND
PATRIOT LAND, LLC D/B/A JF
PATRIOT LAND, LLC, Appellees

On Appeal from the 68th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 11-07174.
Opinion delivered by Justice Moseley.
Justices Francis and Lang participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that:

appellees PATRIOT EXPLORATION, LLC AND PATRIOT LAND, LLC D/B/A JF PATRIOT LAND, LLC take nothing from appellant THOMPSON & KNIGHT LLP.

It is **ORDERED** that appellant THOMPSON & KNIGHT LLP recover its costs of this appeal from appellees PATRIOT EXPLORATION, LLC AND PATRIOT LAND, LLC D/B/A JF PATRIOT LAND, LLC.

Judgment entered this 19th day of August, 2014.