**AFFIRM; and Opinion Filed July 20, 2018.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-16-00875-CV

**PEERLESS INDEMNITY INSURANCE COMPANY,
AMERICA FIRST INSURANCE COMPANY,
THE NETHERLANDS INSURANCE COMPANY,
AND AMERICA FIRST LLOYDS INSURANCE COMPANY A.K.A.
AMERICA FIRST INSURANCE COMPANY, Appellants
V.
GLS MASONRY, INC., Appellee**

**On Appeal from the 192nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-14-11848**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Brown, and Boatright
Opinion by Justice Brown

Following a nonjury trial, appellants Peerless Indemnity Insurance Company, America First Insurance Company, The Netherlands Insurance Company, and America First Lloyds Insurance Company appeal a take-nothing judgment in their suit to collect allegedly unpaid insurance premiums from GLS Masonry, Inc. In four issues, appellants challenge three of the trial court's findings of fact and contend the court should have awarded them attorney's fees. We affirm the trial court's judgment.

## BACKGROUND

GLS performs masonry and stucco work for general contractors. At issue are four insurance policies issued to GLS by the various appellants. For the period of October 12, 2011, to October 12, 2012, GLS had a workers' compensation policy issued by The Netherlands and a commercial general liability policy issued by America First Lloyd's. Those two policies were renewed for 2012-2013. In addition, for the period of October 12, 2012, to October 12, 2013, GLS had a business automobile policy issued by Peerless and a commercial umbrella policy issued by America First.

Appellants' petition alleged GLS owed $101,436.68 in premiums. Appellants sought to recover under three alternative theories, suit on an account under rule 185, breach of contract, and quantum meruit. In their opening statement at trial, appellants asserted the main issue in the case was what amount was due after an audit was performed. In response, GLS disputed the charges and asserted the audit resulted from a misunderstanding. GLS argued it incorrectly identified a number of workers as GLS employees, when instead they were independent contractors.

In this appeal, appellants maintain the trial court should not have rendered a take-nothing judgment because GLS owed money for all four policies. Appellants contend the amount of the premiums due for the workers' compensation policy and the general liability policies increased after the audit. They argue GLS owes additional premiums for the workers' compensation policy because GLS did not have any written contracts with its laborers. They also assert GLS owes additional premiums for the general liability policy because the workers did not have their own liability insurance. The amount of the premiums on the other two policies did not change after the audit, but appellants contend GLS still owes unpaid premiums for those policies.

Before any evidence was presented at trial, appellants moved for judgment on their suit on a sworn account. Appellants argued GLS did not properly deny the claim, citing alleged problems with the affidavit attached to GLS's answer. The trial court denied the motion.

At trial, David Bolden testified that he is a field audit manager for Liberty Mutual Insurance Company. According to Bolden, Liberty Mutual is the holding company for all four appellants. Liberty Mutual was responsible for collecting the billings, writing the policies, auditing the policies, and paying claims on the policies. Bolden oversees an audit staff and his responsibilities include reviewing audits for accuracy.

Bolden testified that two different policies were audited. Appellants' exhibits included documents related to audits of the 2011-2012 commercial general liability and workers' compensation policies. Bolden testified that a week before the policy term ended in October 2012, a "mail form" was sent to GLS "to fill out the exposures the policy was based on." The "mail form" is a document titled "Premium Audit Information Request." The audit was based on a mail form GLS returned to appellants in November 2012. The information was provided by the insured's bookkeeper, Gayla McGinnis. Bolden stated there is an assumption the information provided is correct.

The mail form listed Glen Arvilla as the president of GLS and Lance Williams as an employee. Williams was described as a supervisor. The information GLS submitted for the audit also included a list of thirty people who performed masonry work for GLS and were identified as "subcontractors." Bolden testified that part of the audit process was to prove whether or not those people were independent contractors.

Appellants contacted McGinnis to follow up "regarding the duties of Mr. Williams and Mr. Arvilla, as well as if any certificates of insurance or DWC waivers were there for any of the contractors used by GLS." Bolden stated that DWC 83 waivers are used to confirm that a

–3–

subcontractor is truly an independent contractor. Later, when asked what facts he had that one of the listed workers was a full-time employee, Bolden referenced the fact that on the mail form Williams and Arvilla were both listed as supervisors. He indicated that as supervisors, they must have been directing and controlling work and "the independence of those contractors is then lost." Bolden further stated that based on responses received from McGinnis, appellants were told GLS was directly supervising the contractors.

Bolden testified appellants submitted the audit on January 10, 2013, "including all of the subcontractors as payroll, except those we had received certificates of insurance on." Bolden received an email from GLS's agent, Baldwin Insurance, disputing the audit. At Baldwin's request, appellants sent GLS a new mail form. In March 2013, Bolden received GLS's second mail form. It differed from the previous one. Instead of the list of individuals identified as subcontractors, the second form listed Blackhawk Construction as a subcontractor. The amount GLS paid to Blackhawk was the same amount the previous form showed it paid in total to all individual subcontractors. Appellants questioned why the original form listed individuals and the revised form listed a company. They requested more information from GLS, such as more certificates of insurance or DWC 83 waivers and the checks paid either to Blackhawk or the individuals. According to Bolden, the information they received was outside the policy period and inapplicable to the audit. He also testified that appellants did not receive any contracts between GLS and any of its laborers. The audit report included the following note from the auditor:

> [McGinnis] advised that to her knowledge, the corporate president and one supervisor employee do sales, bidding, billing, coordinating subs and supervision work which is direct supervision on the job sites. Also, she knows that besides the two insured sub's the rest of the sub's do not have their own GL or WC insurance and to the best of her knowledge none have WC waivers either. She e-mailed the insured, Glen Arvilla, on 1/2/13 and copied me on the e-mail asking him to very [sic] that he and the employee do direct supervision and that the subs to [sic] not have WC waivers. As of 1/8/13 I still have not heard back from Glen so I e-mailed him and advised that if I did not hear back by 1/11/13 I would be entering the audit treating himself and the supervisor as employees as doing direct supervision and all

–4–

(except 2) of the subcontractors as uninsured. On 1/11/13, I still had not heard back from Glen so I am entering the audit as I stated I would.

As a result of the audit, there was a change in the calculation of GLS's premiums. Bolden testified that the amount of the premiums increased because certain workers "were not estimated in the original policy." In April 2013, an invoice was sent to GLS for $47,843 in additional premiums for the workers' compensation policy. Appellants also advised GLS's agent that they were going to update the 2012-2013 workers' compensation policy with the audited figures from the 2011-2012 audit. In July 2013, Baldwin advised Bolden that GLS refused to pay. It appears that GLS cancelled at least some of the policies in May 2013, and appellants applied a "pro rata credit."

Bolden testified that the audit changed the amount of the premium on the general liability policy as well. GLS provided the same information on the mail form as it had for the workers' compensation policy. Bolden testified appellants included the labor of the individuals under the "masonry class code." There is another class code for subcontractors who have their own general liability insurance. Bolden indicated that no other insurance was provided for those individuals.

The trial judge asked Bolden what was done to prove that the masons in question were not "1099 folks" and were actually "W-2 employees." Bolden testified that part of the audit process was to "reconcile the employees back to the quarterly unemployment reports" filed with the government. Bolden identified Williams as an employee in this manner. The judge asked what appellants did for the others on the list. Bolden testified they attempted to confirm the information with Arvilla. Bolden stated it was up to Arvilla to provide information proving the masons were true independent contractors. There was no other investigation done to show that these were not 1099 employees.

One of appellants' exhibits was a statement of accounts for GLS, Exhibit B. Bolden testified the document was prepared by "[o]ur billing and collections department" and was sent to

–5–

GLS or Baldwin to let them know the total amount owed on all policies. Bolden stated it gives the history of premium charges, credits and payments. He went through the figures on Exhibit B. It reflected that GLS owed $47,843 in additional premiums on the workers' compensation policy for 2011 to 2012 and $31,231 for the 2012-2013 policy term. The original premium had already been paid for 2011-2012. Bolden testified that $440 was the amount in dispute on the commercial umbrella policy and that the amount still owing on the business automobile policy was $1,538. GLS owed $25,100 in additional premiums on the general liability policy for 2011 to 2012. Bolden also testified that $2,773 was owed for 2012-2013 on that policy due to the audit.

Bolden testified that at least some payment was received from GLS on each of the policies. Exhibit B contained a list of payments GLS made during the second policy term from October 2012 to March 7, 2013. The payments totaled $7,530. Bolden testified the payments were applied to all policies.

Arvilla, the president of GLS, testified that the second mail audit form, the one that mentioned Blackhawk Construction, was not accurate. It had his signature stamp on it, but whoever used his stamp on that document did not have authorization to do so. The form was stamped by mistake. Arvilla testified that Blackhawk had nothing to do with masonry and did not have anything to do with the disputed insurance contracts.

Arvilla further testified that McGinnis requested a second mail form because the first mail form had been done incorrectly. Someone named Rachel Terry, who worked for McGinnis, had completed the first mail form. Arvilla did not look at the form before it went out. Terry called him about a mistake on the form. Arvilla knew she was inexperienced but thought McGinnis was "going to guide her on how to do our forms." Arvilla told her to "get with [McGinnis] and make sure you correct those things." The corrections were made on the second form that referred to Blackhawk.

Arvilla testified that during the primary audit year, GLS paid out $977,449.99 to subcontractors for masonry work. According to Arvilla, the payment amounts to the workers on the first mail audit were correct. Williams was the vice president and did "field operations, oversight." Arvilla testified that GLS made "full payments of what [it] thought the premium should be." Arvilla testified that of the thirty workers on the list, at least half a dozen of them had their own independent contractors who worked for them. Further, all thirty were free to go get different work. Arvilla stated that he would "see them on other job sites." He testified that one of the workers on the list, Alfredo Mendez, was the leader of the group and was in charge of all the independent contractors on the job site. Williams did not tell Mendez when to come to work.

Arvilla was asked about appellants' Exhibit B, which listed the amounts appellants claimed GLS owed on each of the policies. Arvilla testified that he would not owe any of the $47,832 in additional workers' compensation premiums if the workers were independent contractors. As for the 2011-2012 commercial business policy, Arvilla testified that the $25,100 appellants said GLS owed after the audit was based on putting the workers on its payroll. According to Arvilla, because the workers were contract labor, GLS did not owe that amount or an additional $2,773 for the 2012-2013 policy.

During appellants' closing argument, the trial court asked for more information about the $25,100 appellants claimed GLS owed in additional premiums on the general liability insurance policy. Bolden indicated that under that policy, a certificate of insurance was required "or they're considered an employee." Bolden stated that general liability insurance covers the masons' work. If there are "any faults" with it, "it would fall back on GLS Masonry, who then would [fall] back on who actually did the work." If there were "no certificates of insurance or liability for those workers, then the full responsibility falls on GLS." Bolden stated that anyone who is "not insured on general liability is considered an employee" by the liability insurance carrier. If they have

–7–

certificates of insurance, "they actually have coverage in place in case something does go wrong with the mason work."

The trial court asked for proposed judgments and took the matter under advisement. The court later rendered a take-nothing judgment in favor of GLS and made findings of fact and conclusions of law. The court concluded that GLS did not incur any of the account charges claimed by appellants.

## ANALYSIS

Appellants' first three issues challenge three of the trial court's findings. It is unclear whether appellants challenge the legal sufficiency of the adverse findings or the factual sufficiency. They have phrased their issues in terms of what the trial court should or should not have found. Appellants' brief does not include any mention of the applicable standard of review. Because appellants ask us to reverse and remand for a new trial rather than to reverse and render, we construe their issues as factual sufficiency challenges. *See North Park Terrace Apts. V, Ltd. v. Tarrant Appraisal Review Bd.*, No. 02-04-119-CV, 2005 WL 1693580, at \*2 (Tex. App.—Fort Worth July 21, 2005, no pet.) (mem op.).

Findings of fact in a nonjury trial have the same force and dignity as a jury's verdict and may be reviewed for legal and factual sufficiency under the same standards. *Thompson & Knight LLP v. Patriot Expl., LLC*, 444 S.W.3d 157, 162 (Tex. App.—Dallas 2014, no pet.). When a party with the burden of proof challenges the factual sufficiency of an adverse finding, it must demonstrate on appeal that the adverse finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In reviewing for factual sufficiency, we weigh all of the evidence. *Id.* The factfinder is the sole judge of the credibility of the witnesses and may believe one witness over

–8–

another and resolve any conflicts or inconsistences in the testimony. *Thompson & Knight*, 444 S.W.3d at 162.

It is presumed that all fact findings needed to support the judgment were made by the trial court. *Pulley v. Milberger*, 198 S.W.3d 418, 427 (Tex. App.—Dallas 2006, pet. denied). When the trial court's express findings do not address all grounds for recovery or defense, an appellate court implies findings of fact needed to support the judgment. *Id.* We then review implied findings under the applicable standard. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

In their second issue, appellants contend the trial court should have found "that the premiums were properly calculated under the policies of insurance and due." They complain of finding of fact number 3: "The $101,436.68 billing by [Appellants] was based upon the categorization of all of [GLS's] independent contractors being considered employees by [Appellants]." In other findings, the court found that GLS presented evidence of terms of the workers' employment — for example, the workers had the right to control the progress of the work — and appellants presented no evidence as to the terms of the workers' employment. Citing the language of finding number 3, appellants contend the trial court found that all premiums claimed to be due and owing under the policies were based on the inclusion of independent contractors as employees. Appellants argue such a finding is erroneous because the premium for only one of the four policies, the workers' compensation policy, was related to the masons' status as independent contractors or employees. They argue the amount due on the general liability policy was connected to whether the subcontractors had other insurance, not whether they were employees. In addition, appellants assert that the amounts owed on the other two policies, the business automobile policy and the commercial umbrella policy, were not tied to any categorization of employees.

We do not read the challenged finding as narrowly as appellants do. The finding can be read to mean that the total amount appellants sought included premiums based on classification of workers as employees, and not that the entire amount was solely attributable to classification as employees. In addition, there was evidence that the vast majority of the $101,436.68 was due to the categorization of the masons as employees. Appellants' own witness indicated that a worker is considered an employee under the general liability policy if he did not have a certificate of insurance. We will review the factual sufficiency of the evidence of the court's implied findings that GLS did not owe premiums for any of the various policies.

### 1. Workers' Compensation Policy

We first address the workers' compensation policy. The premiums appellants contend GLS owes on that policy make up the majority of the $101,436.68 appellants sought to recover. Appellants contend they properly included the masons in the premium basis for the workers' compensation policy based on the following provision of the Texas Workers' Compensation Act:

> (b) A subcontractor and the subcontractor's employees are not employees of the general contractor for purposes of this subtitle if the subcontractor:
>
> (1) is operating as an independent contractor; and
>
> (2) has entered into a written agreement with the general contractor that evidences a relationship in which the subcontractor assumes the responsibilities of an employer for the performance of work.

TEX. LAB. CODE ANN. § 406.122(b) (West 2015). Appellants cite Bolden's testimony that GLS did not provide appellants with any contracts between it and its workers. Appellants contend the workers were employees for purposes of workers' compensation premium calculations because there were no written agreements between GLS and "its subcontractors."

GLS disputes the applicability of this section of the labor code. GLS argued to the trial court that 406.122(b) did not apply because GLS is not a general contractor. It contends other sections of the act apply to this situation. *See* TEX. LAB. CODE ANN. §§ 406.122(a), 406.142.

At trial, the judge asked Bolden, "[GLS isn't] the general contractor, right, on these job sites?" Bolden said GLS was the "hiring contractor." The judge responded, "But there's a general contractor who's over this whole project, right?" Bolden answered, "Right." The plain language of the provision at issue involves whether a subcontractor's employees are the employees of the general contractor. Appellants rely on a 2001 unpublished opinion from the Third Court of Appeals that discusses section 406.122(b). *See Bedrock Gen. Contractors, Inc. v. Tex. Workers' Comp. Ins. Fund*, No. 03-00-00426-CV, 2001 WL 253594, at *3 (Tex. App.—Austin Mar. 8, 2001, pet. denied) (not designated for publication). Unlike this case, the appellant in *Bedrock* was a general contractor. The issue was whether the employees of a business the general contractor contracted with should have been viewed as the general contractor's employees. *Id.* Other cases discussing this provision also involve general contractors. *See, e.g., TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 69 (Tex. 2016). The trial court could have determined appellants did not establish the applicability of the provision on which they rely. As a result, it is immaterial that GLS did not provide appellants with written agreements between GLS and the masons.

Further, Arvilla testified that the information GLS provided in the first and second mail audits was incorrect due to mistake. Although it is unclear exactly how the information on the first audit form was incorrect, Arvilla testified that GLS would not owe any additional premiums on the workers' compensation policy if his workers were independent contractors. GLS presented evidence that the masons were independent contractors. *See Darensburg v. Tobey*, 887 S.W.2d 84, 88 (Tex. App.—Dallas 1994, writ denied) (test to determine whether worker is employee or independent contractor is whether employer has right to control progress, details and methods of operations of the employee's work). The trial court made a finding, that appellants do not challenge, that the workers controlled the progress of their work and worked for other contractors. The trial court, as factfinder, was entitled to credit GLS's evidence and resolve inconsistencies in

its favor. We conclude the trial court's implied finding that appellants did not establish GLS owed additional workers' compensation premiums is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

## 2. *General Liability Policy*

We next consider appellants' argument about premiums allegedly owed on the general liability policy. Appellants contend GLS owed additional premiums on this policy because the workers did not have their own liability insurance.

Bolden testified that for general liability purposes, whether GLS owed additional premiums did not depend on whether the workers were independent contractors or not. It came down to whether the contractor carries general liability insurance. He explained, "[T]here's not as much liability if they have their own insurance" and they would fall under a "lower rated classification." On cross-examination, Bolden was asked if GLS and America First Lloyd's agreed to this. Bolden testified that "it is governed by the Insurance Services Organization which mandates the general liability insurance rules." Bolden stated it was a "countrywide regulation." Counsel for GLS asked Bolden where his client agreed to be bound by those rules. Bolden answered that the language was "throughout the policy," but he could not identify any specific part.

Thus, Bolden indicated the additional premiums were a result of how workers were classified under a regulation of the Insurance Services Organization. Appellants did not offer this regulation into evidence at trial. Nor did appellants direct the trial court, or this Court in its briefing, to any language in the policy incorporating these classifications or by which GLS agreed to be bound by the terms of the regulation. Under these facts, we cannot conclude the trial court's implied finding that appellants failed to establish GLS owed additional general liability insurance premiums is against the great weight of the evidence.

–12–

### 3. *Business Automobile and Commercial Umbrella Policies*

Finally, we turn to appellants' argument that GLS owed premiums on the two policies that were not audited, the business automobile policy and the commercial umbrella policy. They contend GLS owed $1,539 in premiums on the commercial umbrella policy and $440 on the business automobile policy. Bolden testified that GLS had not paid these amounts. Arvilla testified that GLS made payments on all four policies. He stated that GLS "made full payments what we thought the premium should be."

These two policies were in effect from October 12, 2012, to March 7, 2013, when GLS cancelled them. During this time, GLS paid appellants $7,530.32 in premiums. For the business automobile policy, Exhibit B indicates that $1,538 was the amount of the premium for the policy term, less a credit for cancellation of the policy. For the commercial umbrella policy, Exhibit B indicates that $440 is the amount of the premium for the policy term less a cancellation credit. Bolden testified that GLS paid $7,530 and that its payments were applied to all policies. There was no evidence to show how GLS's payments were apportioned to each policy. The trial court's implied finding that appellants did not establish GLS owed unpaid premiums on these two policies is not so against the great weight and preponderance of the evidence as to be unjust. Having determined that the evidence is factually sufficient to support the trial court's findings that GLS did not owe premiums on any of the policies, we overrule appellants' second issue.

Appellants also brought a suit on a sworn account to recover the premiums on the policies. In their third issue, appellants contend the trial court should have found they proved the elements of a sworn account under rule 185. They challenge the trial court's finding that they "failed to support factually any of the items in Plaintiff[s'] sworn account."

Rule 185 is not a rule of substantive law, but is a rule of procedure with regard to evidence necessary to establish a prima facie right of recovery. *Rizk v. Fin. Guardian Ins. Agency, Inc.*, 584

S.W.2d 860, 862 (Tex. 1979); *Abuzaid v. Modjarrad & Assocs.*, No. 05-16-00777-CV, 2017 WL 5559591, at *7 (Tex. App.—Dallas Nov. 14, 2017, no pet.) (mem. op.); *see* TEX. R. CIV. P. 185. To prove a sworn account, a plaintiff must show that (1) there was a sale and delivery of merchandise or performance of services, (2) the amount or prices were either charged in accordance with an agreement or were customary and reasonable, and (3) the amount is unpaid. *Parillo v. Kofahl Sheet Metal Works, Inc.*, No. 05-15-01037-CV, 2016 WL 3547965, at *3 (Tex. App.—Dallas June 28, 2016, no pet.) (mem. op.). A defendant's verified denial of the correctness of a plaintiff's sworn account under rule 185 forces the plaintiff to put on proof of his claim. *Rizk*, 584 S.W.2d at 862.

Appellants do not challenge the trial court's pretrial denial of their motion for judgment on the sworn account. They acknowledge they were required to put on proof of the elements of the account and contend they did so. We have determined there is factually sufficient evidence to support the trial court's implied findings that appellants did not establish GLS owed unpaid premiums on any of the four policies. Accordingly, the evidence is likewise factually sufficient to support the finding that appellants did not establish there was an unpaid amount on any sworn account. We overrule appellants' third issue.

In light of our disposition of appellants' second and third issues, it is unnecessary for us to reach appellants' first issue in which they contend the trial court incorrectly found that no agreements of insurance were in force. In their fourth issue, appellants contend the trial court should have awarded them attorney's fees. Because we have upheld the trial court's judgment for GLS, appellants were not entitled to their attorney's fees. We overrule appellants' fourth issue.

We affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

160875F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PEERLESS INDEMNITY INSURANCE
COMPANY, AMERICA FIRST
INSURANCE COMPANY, THE
NETHERLANDS INSURANCE
COMPANY, AND AMERICA FIRST
LLOYDS INSURANCE COMPANY
A.K.A. AMERICA FIRST INSURANCE
COMPANY, Appellants

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-11848.
Opinion delivered by Justice Brown,
Justices Lang-Miers and Boatright
participating.

No. 05-16-00875-CV          V.

GLS MASONRY, INC., Appellee

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee GLS MASONRY, INC. recover its costs of this appeal from appellants PEERLESS INDEMNITY INSURANCE COMPANY, AMERICA FIRST INSURANCE COMPANY, THE NETHERLANDS INSURANCE COMPANY, AND AMERICA FIRST LLOYDS INSURANCE COMPANY A.K.A. AMERICA FIRST INSURANCE COMPANY.

Judgment entered this 20th day of July, 2018.