*Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim.App.1997). Here, the question of whether a defendant's trial was closed to the public is a mixed question of law and fact that does not turn on credibility and demeanor.

Unlike a legal question, such as statutory construction, in which we construe only the legal meaning of words and provisions, when dealing with the Sixth Amendment right to a public trial, deferring to the court's findings of fact that are supported by the record is a necessary prerequisite before an appellate court can resolve whether a defendant met his burden to show his trial was closed to the public based on the totality of the evidence, and then the ultimate legal question of whether a defendant's public-trial right was violated. *Abney v. State*, 394 S.W.3d 542, 548 (Tex.Crim.App.2013).

### Conclusion

Having decided that the initial burden of proof is on Appellant to show that her trial was closed to the public, and after explaining the applicable standard of review on appeal, we vacate the judgment of the court of appeals and remand this cause for it to apply the principles of this opinion.

Alcala, J., filed a dissenting opinion in which Johnson, J., joined.

Yeary, J., did not participate.

### *DISSENTING OPINION*

Alcala, J., filed a dissenting opinion in which Johnson, J., joined.

I dissent from this Court's judgment. I voted against rehearing this petition for discretionary review, and I continue to believe that this case was correctly decided on original submission. The rationale for my disagreement with this Court's majority opinion is based on the same reasons shown in this Court's original opinion in this case, in which the former majority of this Court determined that the *voir dire* proceedings were closed and that the closure was unjustified under *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), in light of the trial court's failure to make findings to support a legitimate overriding interest for the closure.

With these comments, I respectfully dissent.

**Enrique N. PONTE, Jr. M.D., Pediatrix Medical Services, Inc., Jorge Fabio Llamas–Soforo, M.D., and Jorge Fabio Llamas–Soforo, M.D., P.A. d/b/a El Paso Eye Center, Appellants**

v.

**Marcela BUSTAMANTE and Jose Bustamante, as Next Friends of Daniella Bustamante, Appellees**

No. 05–12–01394–CV

Court of Appeals of Texas, Dallas.

Opinion Filed May 28, 2015

Michelle Robberson, Diana L. Faust, R. Brent Cooper, Elizabeth M. Fraley, Heather Kanny, Jake Michael Ramey, James E. Girards, J. Stephen Gibson, Domingo Garcia, Michael W. Huddleston, Dallas, TX, Paul M. Braden, El Paso, TX, Lisa Wilson, Susan Cassida Cooley, Jennifer Gossom Martin, Addison, TX, for appellants.

Before Justices Stoddart[1], Whitehill[2], and Schenck[3]

## OPINION ON REHEARING

Opinion by Justice Whitehill

We deny appellees' motion for rehearing. On the Court's own motion, we withdraw our opinion dated December 31, 2014, and vacate the judgment of that date. This is now the Court's opinion.

Appellees' daughter Daniella was born prematurely. Her treating physicians included appellants Enrique N. Ponte Jr.,

M.D., and Jorge Fabio Llamas–Soforo, M.D. Despite the doctors' efforts, Daniella eventually went blind in her right eye and lost most of the vision in her left eye. Appellees, acting on Daniella's behalf, sued Ponte, Llamas, and their employers. The case was tried to a jury, which made findings in appellees' favor. The trial judge rendered judgment against appellants based on the jury's findings, reduced by settlement credits. Ponte, Llamas, and their employers appealed. Because appellees adduced no non-conclusory evidence of causation, we reverse and render judgment that appellees take nothing.

## I. BACKGROUND

### A. Facts

The evidence adduced at trial supported the following facts. Appellee Marcela Bustamante gave birth to Daniella at Del Sol Medical Center in El Paso on May 19, 2005. The admission note describes Daniella as weighing 600 grams at birth and as having a "23 week 1 day gestational age." She was admitted to Del Sol's neonatal intensive care unit. Appellant Ponte, a neuroneonatologist and an employee of appellant Pediatrix, was medical director of Del Sol's neonatal ICU. Ponte was Daniella's attending physician while she was in Del Sol's neonatal ICU.

Daniella suffered from several medical problems related to her premature birth, including seizures, bleeding and inflammation in the brain, and patent ductus arteriosus, which is a condition involving the blood vessels near her heart that required

**1.** The Honorable Justice Craig Stoddart succeeded the Honorable Jim Moseley, a member of the original panel. Justice Stoddart has reviewed the briefs and record before the Court.

**2.** The Honorable Justice Bill Whitehill succeeded the Honorable Kerry FitzGerald, a

member of the original panel. Justice Whitehill has reviewed the briefs and record before the Court.

**3.** The Honorable David Schenck succeeded the Honorable Michael O'Neill, a member of the original panel. Justice Schenck has reviewed the briefs and record before the Court.

surgery to repair. Ponte was concerned that Daniella would eventually develop a damaging eye condition called retinopathy of prematurity (ROP), which involves abnormal blood-vessel growth in the retina and can cause scarring, detachment of the retina, and blindness.

Ponte contacted appellant Llamas, an ophthalmologist, and asked him to examine Daniella. Llamas examined Daniella's eyes on July 4, 2005, and he observed no sign of ROP. Llamas's note from the examination reflects that there was to be a follow-up examination in four weeks. Llamas examined Daniella again on August 1. During that examination he determined that Daniella had developed ROP, and he recommended surgical treatment of the ROP as soon as possible. He performed the surgery on August 4. That procedure involved using a laser to burn parts of Daniella's retinas. The surgery sacrifices the patient's peripheral vision to some extent to conserve his or her "central vision."

At some point after the August 4 surgery, Daniella's right retina became detached. As a result, she is blind in her right eye, and eventually the eye may have to be removed. She has some vision in her left eye, but it is significantly impaired. There was evidence that Daniella must wear glasses and must hold symbols a few inches from her left eye in order to see them. There was also evidence that she suffers from other conditions, such as cerebral palsy, and that she is developmentally delayed to an undefined extent.

## B. Procedural history and issues on appeal

In 2008, appellees, as next friends of Daniella, sued appellants and Del Sol Medical Center's owners for negligence and gross negligence that allegedly caused Daniella's vision impairment. The owners settled with appellees before trial. The remaining claims were tried to a jury in 2011. The trial judge submitted jury questions regarding the negligence of Ponte, Llamas, and Del Sol Medical Center. He did not submit any questions regarding any independent negligence by Pediatrix or by Llamas's professional association.

The jury found Ponte, Llamas, and Del Sol Medical Center negligent. It apportioned 45% of the responsibility for Daniella's injury to Ponte, 45% to Llamas, and 10% to Del Sol. For damages, the jury found that Daniella would incur future medical expenses of $962,000 after she turned 18 and future attendant care expenses of $988,000 after she turned 18. The jury also found damages for Daniella's pain and mental anguish, disfigurement, and physical impairment totaling $174,000. Because the verdict was not unanimous, the jury did not answer the question about Ponte's and Llamas's gross negligence.

The parties engaged in post-verdict motions practice. The trial judge signed a final judgment, a corrected final judgment, and finally a second corrected final judgment. In the second corrected final judgment, the judge rendered judgment against appellants based on the jury verdict, adjusted to account for the settlement credit. In that judgment, Llamas and his professional association were held jointly and severally liable for about $873,000, and Ponte and Pediatrix were separately held jointly and severally liable for the same amount.

## II. SUFFICIENCY OF THE PROXIMATE CAUSE EVIDENCE

Appellants argue that the evidence is legally insufficient to support the jury's findings that Ponte's and Llamas's negligence proximately caused any injury to Daniella's vision. Appellants preserved their legal sufficiency challenge by means

of a motion for judgment notwithstanding the verdict attacking the legal sufficiency of the evidence of proximate cause.[4]

## A. Standard of review

When an appellant attacks the legal sufficiency of the evidence to support an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. If evidence is so weak that it does no more than create a surmise or suspicion of the matter to be proved, the evidence is no more than a scintilla and, in legal effect, is no evidence. The evidence is legally sufficient if it is sufficient to enable reasonable and fair-minded people to reach the verdict under review. In conducting our review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. We must credit evidence favorable to the verdict if a reasonable person could, and we must disregard contrary evidence unless a reasonable person could not.[5]

## B. Applicable law

 In a medical-malpractice case, the plaintiff must prove the existence of a legal duty, a breach of that duty by the defendant, proximate causation, and damages.[6] Proximate cause has two sub-elements of foreseeability and cause in fact.[7] Foreseeability requires proof that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission.[8] Cause in fact requires proof (1) that the defendant's negligence was a substantial factor in bringing about the injuries and (2) that absent the negligence—that is, but for the negligent act or omission—the harm would not have occurred.[9] The plaintiff must introduce evidence of a "reasonable medical probability" or a "reasonable probability" that her injury was caused by the defendant's negligence, "meaning simply that it is 'more likely than not' that the ultimate harm or condition" resulted from the defendant's negligence.[10] Proof of a mere possibility of causation, however, is insufficient.[11]

 If the causation issue is not one within the experience of a lay person, the plaintiff must ordinarily produce expert testimony of proximate causation.[12] The parties did not dispute that expert testimony of proximate causation was required in this case. An expert cannot opine simply that the defendant's negligence probably caused the injury; the expert must also

4. See Grocers Supply, Inc. v. Cabello, 390 S.W.3d 707, 725 (Tex.App.–Dallas 2012, no pet.) (listing the methods of preserving legal-sufficiency challenges).

5. Hoss v. Alardin, 338 S.W.3d 635, 640–41 (Tex.App.–Dallas 2011, no pet.).

6. See Creech v. Columbia Med. Ctr. of Las Colinas Subsidiary, L.P., 411 S.W.3d 1, 5–6 (Tex.App.–Dallas 2013, no pet.).

7. Id. at 6.

8. Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 478 (Tex.1995).

9. Rodriguez–Escobar v. Goss, 392 S.W.3d 109, 113 (Tex.2013) (per curiam).

10. Jelinek v. Casas, 328 S.W.3d 526, 532–33 (Tex.2010) (quoting Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 399–400 (Tex. 1993)).

11. See Duff v. Yelin, 751 S.W.2d 175, 176 (Tex.1988) ("[T]he plaintiff must establish a causal connection beyond the point of conjecture; proof of mere possibilities will not support the submission of an issue to the jury."); see also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 247 (Tex.2008) (" 'Perhaps' and 'possibly' indicate conjecture, speculation or mere possibility rather than qualified opinions based on reasonable medical probability.").

12. Creech, 411 S.W.3d at 6.

explain how and why the negligence proba- bly caused the injury.[13]

██ If no factual basis is offered for the causation opinion, or the factual basis that is offered provides no support, the causation opinion is conclusory, even if it is not objected to.[14] Expert testimony that is conclusory, speculative, or based on assumed facts contrary to the evidence is legally insufficient to prove the facts testified to.[15]

## C. Review of the evidence

### 1. Background facts and standard-of-care evidence

The jury heard evidence of these background facts. Normally, retinal blood vessels develop flat against the back wall of the retina. But in premature babies, the retina and its blood vessels are not fully developed at birth. Such babies often develop ROP, which is characterized by the development of weak, abnormal blood vessels that can actually grow out into the center cavity of the eye. ROP is referred to as "plus disease" if the abnormal blood vessels are thick, tortuous, and located in the back of the eye near the optic nerve. Scientists believe that ROP is caused when the parts of the retina that lack blood vessels produce a growth factor that triggers the development of the abnormal blood vessels. Evidence was presented that ROP eventually goes away by itself, and that not all babies who develop ROP need treatment. In some cases, however, ROP can cause scar tissue that can in turn cause retinal detachment and vision loss. Thus, in serious ROP cases, surgical treatment is appropriate. The current form of treatment is laser surgery, which uses a laser to burn some of the parts of the retina that produce the growth factor. The evidence showed that it was extremely likely that Daniella would eventually develop ROP. Ponte himself testified that 100% of babies born at 23 weeks develop ROP.

There was evidence that in 2001, the American Academy of Pediatrics and the American Academy of Ophthalmology promulgated guidelines recommending that physicians start examining premature babies for ROP at the later of four to six weeks after birth or 31 to 33 weeks gestational age. The 2001 guidelines were not changed until 2006, and Ponte testified that he followed the 2001 guidelines until 2006 (the year after Daniella's birth and treatment).

Appellees' expert witness William Good, M.D., a pediatric ophthalmologist, however, testified that a study called the Early Treatment for Retinopathy of Prematurity (ETROP) was conducted before 2003. He opined that publishing of the study's results in 2003 changed the standard of care very quickly. Good testified that the ETROP study showed that babies should be screened and treated for ROP earlier than was previously believed.

Good identified three standard of care breaches in this case, the first two he ascribed to both Ponte and Llamas and the last he ascribed to Llamas alone. First,

**13.** *Jelinek,* 328 S.W.3d at 536; *see also Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999); *Merrell Dow Pharms., Inc. v. Havner ex rel. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

**14.** *See Jelinek,* 328 S.W.3d at 536.

**15.** *Thompson & Knight LLP v. Patriot Exploration, LLC,* 444 S.W.3d 157, 162 (Tex.App.– Dallas 2014, no pet.); *see also Wal–Mart Stores, Inc. v. Merrell,* 313 S.W.3d 837, 840 (Tex.2010) (per curiam) (concluding that expert opinion was conclusory and constituted no evidence of causation); *Qui Phuoc Ho v. MacArthur Ranch, LLC,* 395 S.W.3d 325, 333 (Tex.App.–Dallas 2013, no pet.) (holding that conclusory statements and opinions are not probative evidence).

he testified that the four-week delay between examinations, from July 4 to August 1, violated the standard of care because Daniella should have been examined more than once in the interim. Specifically, Daniella should have been examined on July 11, July 18, and, depending on the results of the July 18 exam, on or before July 25. Good testified that if Daniella had been examined on a proper schedule, in reasonable medical probability Daniella would have received laser treatment on or about July 25.

Second, Good testified that the three-day delay in treatment between August 1 and August 4 violated the standard of care because Daniella's ROP should have been treated earlier than that.

Third, he testified that the manner in which Llamas performed the laser surgery was inadequate.

Appellees also introduced testimony from expert witness and neonatologist Dale Phelps, M.D. She testified that Ponte breached the standard of care by failing to "work[ ] out a set of written guidelines for his staff to communicate with the ophthalmologist." She indicated that this criticism related to Daniella's follow-up examinations for ROP. She also testified that Llamas breached the standard of care by scheduling Daniella's follow-up eye examination four weeks after the July 4 exam and by failing to describe his observations in his notes from the July 4 exam in a way that could be understood by the staff that he was working with. She testified that, depending on Llamas's observations on July 4, a follow-up eye examination should have been done somewhere from one to three weeks after the July 4 examination. She did not, however, provide any testimony regarding the surgery itself.

## 2. Proximate-cause evidence

Appellees do not argue that they proved cause in fact without expert testimony. They instead rely on Good and Phelps for that evidence. Good testified about the effect of delaying treatment after Llamas examined Daniella on August 1: "[E]very day that went by [without treatment] put [Daniella] at further risk of suffering an adverse outcome." He then criticized the manner in which Llamas performed the laser surgery as follows:

Thirdly, as I have looked at the pictures of the treatment administered by Dr. Llamas to Daniella, it looks to me like it was inadequate. There are skip lesions. There are areas where the retinal burns either didn't take or were not administered. *And this also contributed to, in a proximate way, to her loss of vision in the right eye and some detrimental loss of vision in the left eye.*

. . .

[T]he treatment pattern is not as confluent as it should have been, even where the laser burns have taken. But there are also areas called skip areas. These are areas where there is no treatment at all, *and these contribute to an adverse outcome in a manageable ROP.*

(Emphases added.) Later, Good addressed causation more globally and at greater length:

Q. What injury or change in Daniella resulted from the failures to examine appropriately, timely, and to treat properly and timely, more likely than not?

A. Well, if you look at the various places where negligence occurred, in an incremental fashion, each of those contributed to the poor visual outcome that Daniella experienced. The delay in screening examinations for four weeks to a probability prevented Dr. Llamas from identifying ROP when it could have been treat-

ed earlier. That would have improved the chance of a good visual outcome for her. The delay in laser treatment for three days also in my opinion incrementally increased the chances of a bad outcome for her. And then, finally, the inadequate laser treatment I think really was the coup de grace here, and it basically placed these eyes at extremely high risk and was causally or proximately responsible for blindness in the right eye and poor vision in the left eye.

Q. All right. Let me tell you that in Texas, the definition of proximate cause is that cause which, in a natural and continuous sequence, produces an event, and without which cause the event would not have occurred. And there may be more than one proximate cause of an event. Can you accept that definition?

A. Yes.

Q. Is Daniella's blindness in your opinion proximately caused by the negligence that you described for us?

A. Yes, it was.

Q. Can you tell us more likely than not what her vision would be like had these defendants acted properly?

A. More likely than not, she would have what I would call a sighted life. In other words, she would be able to use her vision to function in her environment.

Good also opined that Daniella's vision would be better than 20/200 if appellants had given her appropriate treatment. Instead, her right eye is blind, and her left eye is roughly 20/1200 or 20/1300.

Phelps, who focused on the four week gap between the July 4 and the August 1 examinations as the principal negligence

committed by Ponte and Llamas, provided the following causation testimony:

Q. ... So what more likely than not would have resulted had Dr. Llamas and Dr. Ponte followed the follow-up examination schedule in the guidelines?

A. He would have seen the ROP as it started up or as it became established and before it became advanced. If it was looking very threatening, they might have moved their schedules—exam schedules closer together to make sure they caught it quickly when it got to the point where it needed surgery.

Q. Okay.

A. That was—that would be my expectation.

Q. Do you think more likely than not Daniella would have functional vision had they done it correctly?

A. Yes.

Shortly thereafter, · appellees' counsel again asked Phelps, "Would Daniella Bustamante more likely than not in your opinion have functional vision had they done it correctly—these doctors done this correctly?" Phelps answered, "Yes."

### a. Ponte

■ After reviewing both experts' testimony, we conclude that appellees adduced legally insufficient evidence of cause in fact against Ponte.

#### (1) Good's causation testimony

Good did not testify that Ponte's negligent acts and omissions, individually or collectively, were more likely than not a but-for cause of Daniella's injuries. Rather, he testified that each instance of negligence by both doctors contributed "in an incremental fashion" to Daniella's poor visual outcome. Ponte's first act of negli-

gence was failing to ensure that Daniella received additional eye examinations between July 4 and August 1. As to that negligence, Good testified as follows: "The delay in screening examinations for four weeks to a probability prevented Dr. Llamas from identifying ROP when it could have been treated earlier. That would have improved the chance of a good visual outcome for her." This testimony is insufficient to support a finding of but-for causation regarding this delay because it does not show that the lack of interim examinations was, more likely than not, a but-for cause of Daniella's injuries. Unquantified evidence that a different course of action would have created a lower risk of harm is legally insufficient to show but-for causation.[16]

Good also failed to establish but-for causation as to Ponte's other act of negligence, permitting a three day delay in the performance of the laser surgery after the August 1 examination. According to Good, this delay "incrementally increased the chances of a bad outcome for" Daniella. Again, his testimony that swifter surgery would have had some unquantified positive effect on Daniella's chance of a better outcome is legally insufficient to show but-for causation.[17]

Good gave additional causation testimony after he added to the equation Llamas's negligence in performing the laser surgery. Good described the inadequate laser surgery as "the coup de grace" and said that the surgery "was causally or proximately responsible for blindness in the right eye and poor vision in the left eye." Appellees' counsel then gave Good a definition of proximate cause that included the cause-in-fact requirement, and he asked Good whether all of the negligence he had described, committed by both Ponte and Llamas, proximately caused Daniella's injuries: "Is Daniella's blindness in your opinion proximately caused *by the negligence that you described for us?*" (Emphasis added.) Good answered, "Yes, it was." Counsel then asked, "Can you tell us more likely than not what her vision would be like had *these defendants* acted properly?" (Emphasis added.) Good answered, "More likely than not, she would have what I would call a sighted life. In other words, she would be able to use her vision to function in her environment."

When Good expressed a causation opinion in terms of but-for causation, he predicated his opinion on the *combined negligence* of both Ponte and Llamas as to all three events—the negligent examination schedule, the three day delay in performing the surgery, and Llamas's negligent performance of the laser surgery. But Ponte was not involved in performing the laser surgery, so he was not responsible for the consequences of any negligence that necessarily included negligent performance of the laser surgery. As emphasized above, *Good declined to opine that the four week delay in examining Daniella or the three day delay in performing the surgery, either separately or considered together, was more likely than not a but-for cause of Daniella's injuries.* We conclude that Good's testimony constitutes no evidence that Ponte's negligence was a but-for cause of the injuries to Daniella's eyes.

### (2) Phelps's causation testimony

■■■ This leaves the causation testimony of Phelps, who identified Ponte's negli-

---

**16.** *See Providence Health Ctr. v. Dowell,* 262 S.W.3d 324, 328 (Tex.2008) (holding that testimony that decedent "would have improved" if he had been hospitalized and that he would have been at "lower risk" of suicide upon discharge was no evidence of causation).

**17.** *See id.*

gence as failing to "work[ ] out a set of written guidelines for his staff to communicate with the ophthalmologist." She later explained that her Ponte criticisms concerned Daniella's "follow-up for ROP." As to causation, Phelps said that had Llamas and Ponte used the follow-up schedule in the guidelines, they might have moved the exams closer together to make sure they caught Daniella's ROP quickly. And Phelps testified that, more likely than not, Daniella would have functional vision if Ponte and Llamas had "done it correctly."

We conclude that Phelps's testimony about the causal connection between Ponte's negligence and Daniella's injuries was conclusory and therefore constituted no evidence of but-for causation against Ponte.[18] The record contains no factual explanation to substantiate Phelps's opinion that earlier examinations and earlier laser treatment more likely than not would have prevented Daniella's injuries.

Phelps testified about the ETROP study results and said that favorable outcomes were more common among babies who received early laser treatment as compared to babies who received laser treatment later. She also testified that bad results occurred after conventionally timed laser treatment about 14% to 16% of the time and that babies in the early treatment group suffered bad results only about 9% of the time. But she did not say that the ETROP study showed that earlier treatment of Daniella probably would have prevented her injuries in her particular case. (In fact, Good specifically denied that the ETROP study could be used to determine whether a delay in treatment actually affected a baby's vision.)

When the evidence shows that a particular treatment helps some patients and not others, the expert must explain the facts justifying a conclusion that a particular patient probably would have been helped by the treatment.[19] In this case, there was no factual substantiation or explanation to support Phelps's testimony that earlier treatment, more likely than not, would have improved Daniella's outcome. Her causation testimony was conclusory and constituted no evidence of causation against Ponte.

**b. Llamas**

■ Next, we examine the cause in fact evidence as to Llamas. We hold that all of the evidence that Llamas's negligence caused Daniella's injuries was conclusory and therefore is no evidence of proximate cause.

**(1) Phelps's causation testimony**

We have already held that Phelps's causation testimony was conclusory and non-probative as to Ponte. Phelps did not offer any different causation testimony as to Llamas. Indeed, she lumped Ponte and Llamas together when she opined that Daniella would have functional vision if Ponte and Llamas had not been negligent regarding Daniella's follow-up exam schedule. Accordingly, we conclude that Phelps's conclusory causation testimony was no evidence of but-for causation against Llamas.

**(2) Good's causation testimony**

This leaves the testimony of Good, who identified Llamas's three negligent acts as failing to examine Daniella between July 4 and August 1, failing to perform the laser

---

18. *See Jelinek,* 328 S.W.3d at 536 ("The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury.").

19. *Archer v. Warren,* 118 S.W.3d 779, 787–88 (Tex.App.–Amarillo 2003, no pet.).

surgery promptly enough after the August 1 examination, and negligently performing the laser surgery itself. As discussed above, Good did not testify that the first two negligent acts were, more likely than not, a but-for cause of Daniella's vision injuries. He said only that those acts increased the risk of harm to some unknown and unquantified degree. This is no evidence of but-for causation against Llamas regarding these allegedly negligent acts.[20]

We next consider Good's testimony regarding Llamas's third act of negligence, his negligent performance of the laser surgery. When Good considered the surgery by itself, he did not opine clearly that the surgery alone was probably a but-for cause of Daniella's injuries. He testified that the inadequate surgery "contributed to, in a proximate way, to her loss of vision in the right eye and some detrimental loss of vision in the left eye." He also testified that the flaws in the surgery "contribute[d] to an adverse outcome in a manageable ROP." But Good did not opine that the inadequate surgery alone was, more likely than not, a but-for cause of Daniella's vision loss. His opinions that the negligence "contributed to" the vision loss are legally insufficient evidence of proximate cause.[21]

But Good did say that all three negligent acts by Llamas collectively were, more likely than not, a but-for cause of Daniella's injuries. After testifying that Llamas's first two negligent acts increased Daniella's risk, Good testified that Llamas's negligent performance of the laser surgery "basically placed these eyes at extremely high risk *and was causally or proximately responsible for blindness in the right eye and poor vision in the left eye.*" (Emphasis added.) Then appellees' lawyer defined proximate cause for Good, and Good testified that Daniella's extremely limited vision was proximately caused by "the negligence" that Good had previously described—meaning, in context, all the negligence by both appellants. Good also testified that if appellants had acted properly, "[m]ore likely than not, [Daniella] would have . . . a sighted life. In other words, she would be able to use her vision to function in her environment." Good's testimony, taken at face value, was sufficient to show that Llamas's negligence, considered collectively, was more likely than not a but-for cause of Daniella's injuries. But, as discussed below, that does not answer the question of whether the causation evidence was legally sufficient.

We next consider Llamas's argument that Good's cause-in-fact testimony against Llamas was conclusory. The question is whether Good explained how and why Llamas's three acts of negligence caused the injury.[22] Good testified that the delays in treatment increased the likelihood of injury to an undefined extent and, when combined with the negligent surgery, became a but-for cause of Daniella's injuries. But he did not explain how or why the delays in treatment contributed to Daniella's injuries or worsened her chances of a better outcome. The only basis for Good's opinion about the effect of the delays in treat-

20. *See Providence Health Ctr.,* 262 S.W.3d at 328.

21. *See Christus St. Mary Hosp. v. O'Banion,* 227 S.W.3d 868, 875 (Tex.App.–Beaumont 2007, pet. denied) (testimony that event "contributed to" patient's death was no evidence of proximate cause); *Sisters of St. Joseph of Tex., Inc. v. Cheek,* 61 S.W.3d 32, 36–37 (Tex.

App.–Amarillo 2001, pet. denied) (testimony that negligence "caused or contributed to" patient's death was no evidence of proximate cause).

22. *See Jelinek,* 328 S.W.3d at 536; *see also Qui Phuoc Ho,* 395 S.W.3d at 333 ("[A]n expert's simple *ipse dixit* is insufficient to establish a matter. . . .").

ment we can find in the testimony is the ETROP study, which he testified showed that earlier treatment of ROP led to better outcomes. But Good did not explain how the ETROP study showed that Daniella's particular outcome would have been affected by earlier treatment. He also agreed that the ETROP study was not designed "to determine whether a delay in screening or a delay in treatment actually affected a baby's vision," and that it would be "an incorrect use of that study" to "claim that it was designed to detect or to look at the effect of delay." So Good's testimony about the causal connection between the delays in examination and treatment in this case was conclusory—it was not supported by facts and explanations as to how and why the delays caused Daniella's injuries in this case.

This leaves Good's testimony that Llamas's negligent performance of the laser surgery was causally connected to Daniella's injuries. Good testified that laser therapy has an overall success rate of over 75%. He criticized Llamas's surgery because, Good claimed, he could see from photographs that there were areas where Llamas failed to make the laser burns sufficiently close together, and there were other places, which he called "skip lesions" or "skip areas," where the laser burns "didn't take" or where Llamas applied no laser treatment at all. Good testified that in a proper laser surgery, the burn areas should be confluent or nearly confluent, meaning no more than one burn width apart. He also said that leaving skip areas can allow the disease to progress further.

On the other hand, Good also testified that there was a significant chance that Daniella would have suffered the same bad outcome even with proper treatment. On

cross-examination, Good agreed that 89 of the babies involved in the ETROP study, or about 22%,[23] suffered retinal detachment despite receiving early surgical treatment. Good admitted he did not review the ETROP results to see how close together the laser burns were in the 89 babies who suffered retinal detachments; rather, he assumed that the laser therapy was appropriate. He did not explain why he concluded Daniella would not have been among the 22% of babies who suffered blindness even after receiving proper laser treatment. Good also testified that there are several factors that make a bad outcome more likely even if proper treatment is given, and that Daniella had some of those factors, including "plus disease," extremely low birth weight, and gestational age (apparently meaning Daniella's extreme prematurity). He did not explain why or how different performance of the laser surgery, more likely than not, would have overcome Daniella's preexisting adverse risk factors.

■ The key legal principle is stated in the *Jelinek* case: "[W]hen the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion."[24] In this case, the evidence showed that there was a significant chance that even a properly performed surgery would not have changed Daniella's outcome, but Good testified that Daniella probably would have had a better outcome if Llamas had performed the surgery properly. Thus, it was incumbent on Good or some other expert to explain why his conclusion that Daniella

**23.** Llamas testified without contradiction that about 400 babies were involved in the ETROP study.

**24.** 328 S.W.3d at 536.

would have, within reasonable medical probability, had a better outcome was medically preferable to the inference that Daniella would have suffered the same bad outcome even with a better-performed surgery.

Appellees rely heavily on the following testimony by Good in their attempt to show that Good sufficiently explained the basis for his causation opinion:

> [A]s I have looked at the pictures of the treatment administered by Dr. Llamas to Daniella, it looks to me like it was inadequate. There are skip lesions. There are areas where the retinal burns either didn't take or were not administered. And this also contributed to, in a proximate way, to her loss of vision in the right eye and some detrimental loss of vision in the left eye.
>
> . . .
>
> When a laser burn takes, it makes a white mark. And where there is no laser treatment or the laser burn does not take, there is no mark.
>
> And so there are—the treatment pattern is not as confluent as it should have been, even where the laser burns have taken. But there are also areas called skip areas. These are areas where there is no treatment at all, and these contribute to an adverse outcome in a manageable ROP.
>
> . . .
>
> We think the physiology is that the cells that exist outside of where the retina is vascularized, meaning the area where there are no blood vessels, we think that these cells after a while begin to send a signal. The signal is a protein, which is a growth factor. It is called vascular endothelial growth factor. And this sig-

nal incites the development of abnormal, more fragile blood vessels to grow.

> So literally what happens is, blood vessels begin to grow instead of normally along—flat against the back wall of the retina, they start to grow out into the center cavity of the eye.
>
> Eventually, these blood vessels will go away, but in the process they bring in cells that are precursors to the formation of scar tissue. And so the retina can detach, and it can detach partially or it can detach completely.

And then, when asked whether skip areas "keep the disease progressing instead of stopping," Good answered, "Well, it can, yes." In his testimony, Good gave a general explanation of the physiology underlying ROP, and in Phelps's testimony, she explained that using a laser to burn part of the retina that lacks blood vessels prevents the release of the growth factors that cause ROP. The record thus contains evidence explaining how laser treatment effectively treats ROP *when it does* effectively treat ROP. But no one explained why laser treatment failed roughly 22% of the time in the ETROP study, and no one explained why proper laser treatment in Daniella's specific case probably would have resulted in a better outcome, *despite Daniella's specific risk factors that made her prognosis worse than it otherwise would have been.*

This case is similar to the *Jelinek* case, in which a hospital negligently failed to treat its patient with antibiotics as prescribed, and the patient suffered a significant amount of pain thereafter.[25] The patient later died, and her survivors sued the hospital for negligence.[26] The plaintiffs won a judgment based on a jury verdict, but the supreme court reversed because

25. 328 S.W.3d at 530.

26. *Id.*

the plaintiffs' expert causation testimony was conclusory. The plaintiffs' expert testified that the patient's pain was probably caused by the failure to give her the prescribed antibiotics, but he acknowledged that the pain could have been caused by two other factors that were present and that the antibiotics would not have treated.[27] Although the expert testified that the hospital's negligence probably caused increased pain and suffering to the patient, he did not explain why this possible cause was more likely than the other possible causes that would not have been affected by the hospital's negligence.[28] The supreme court held that the expert's causation testimony was conclusory and constituted no evidence of causation.[29]

Here, like *Jelinek*, the evidence showed that there was a significant chance that Daniella would have suffered the same injuries even if Llamas had performed the surgery as Good said he should have. The evidence also showed that Daniella had specific risk factors that made a bad outcome in her case more likely. But Good did not explain why performing the surgery differently probably would have prevented Daniella's injuries in her particular case, despite the possibility of a bad outcome even with proper treatment and despite her particular risk factors that increased the likelihood of a bad outcome. After reviewing the record, we conclude that Good's causation testimony regarding Llamas's negligent surgery was conclusory because Good did not explain how and why performing the surgery differently probably would have resulted in a different outcome for Daniella.

### (3) Statistical evidence

■ Appellees' motion for rehearing does not argue that Good or Phelps offered enough factual and explanatory testimony to make their ultimate causation opinions nonconclusory. Instead they argue that the evidence about the ETROP study results was sufficient evidence of but-for causation, citing *Merrell Dow Pharmaceuticals, Inc. v. Havner ex rel. Havner*.[30] *Havner* involved the sufficiency of causation proof in the context of toxic substance exposure, not medical malpractice. But to the extent it is relevant to the instant case, it does not aid appellees.

In *Havner*, the Texas Supreme Court specifically declined to hold "that a single epidemiological test is legally sufficient evidence of causation."[31] The court also held that:

> To raise a fact issue on causation and thus to survive legal sufficiency review, a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. **A claimant must show that he or she is similar to those in the studies.** This would include proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was consistent with that experienced by those in the study. *See generally* Thompson, *supra*, 71 N.C. L.Rev. at 286–88. Further, if there are other plausible causes of the injury or condi-

27. *Id.* at 535–36.

28. *Id.* at 536.

29. *Id.* at 538.

30. 953 S.W.2d 706 (Tex.1997).

31. *Id.* at 718. The court later commented that an "isolated study" finding a statistically significant association between a drug and birth defects would not be legally sufficient evidence of causation. *Id.* at 727.

tion that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *See generally E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 559 (Tex.1995) (finding that the failure of the expert to rule out other causes of the damage rendered his opinion little more than speculation); *Parker v. Employers Mut. Liab. Ins. Co.,* 440 S.W.2d 43, 47 (Tex.1969) (holding that a cause becomes "probable" only when "in the absence of other reasonable causal explanations it becomes more likely than not that the injury was a result").[32]

We conclude for several reasons that the ETROP study evidence constitutes no evidence of but-for causation of Daniella's injuries.

First, there is no evidence showing that Daniella's particular characteristics were substantially similar to the ETROP study group's characteristics. No summary or report of the ETROP study's results was admitted into evidence, so we know very little about it other than its concluding results. Accordingly, we have no way to determine how the ETROP results might apply to Daniella's particular facts, and there is no reasonable basis for concluding that the ETROP study's results would also apply to her. Good admitted that Daniella had risk factors that made a bad outcome more likely in her case regardless of the course of treatment. Nothing in the record indicates whether the babies involved in the ETROP study suffered from any of the same risk factors that Daniella had. The record does not disclose whether the ETROP babies who experienced bad outcomes despite early treatment were more similar to Daniella than were the ETROP babies who experienced good outcomes. Without evidence showing that Daniella

was similar to the babies involved in the ETROP study, the ETROP study cannot support a causation finding.[33]

Second, this excerpt from the supreme court's *Jelinek* decision represents that opinion's core principles:

It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury. We have rejected expert opinions not grounded in a sound evidentiary basis: "[I]f no basis for the opinion is offered, **or the basis offered provides no support**, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. '[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.' " *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009) (quoting *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999)); *see also Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 637 (Tex.2009) ("Conclusory or speculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable."). **When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only**

---

**32.** *Id.* at 720 (emphasis added).

**33.** *See id.*

some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion. *See Lenger [v. Physician's General Hospital, Inc.]*, 455 S.W.2d [703] at 707 [(Tex.1970)] ("[E]xpert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event."); *Hart [v. Van Zandt]*, 399 S.W.2d [791] at 792 [(Tex.1965)] ("The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury.").[34]

*Jelinek* thus instructs that, where an expert attempts to explain his or her conclusory opinion, that explanation must have a sound evidentiary basis or the expert's opinion is still no evidence.[35] In *Jelinek*, like here, the plaintiffs attempted to prove causation with circumstantial evidence, but they lacked legally sufficient evidence because they did not exclude other potential causes for the patient's injuries.[36]

Third, the ETROP study evidence furnishes no causation evidence regarding the theory that Llamas's negligent performance of the surgery caused Daniella's blindness. Good testified that Llamas's surgery performance was negligent because the laser burns were not as confluent as they should have been and because there were skip areas. But he did not testify that the ETROP study surgeries conformed to the standard of care as Good defined it. He acknowledged that he did not look at all of the babies' eyes that were operated on in the ETROP study to see how those surgeries were performed:

Q. In fairness, in the ETROP, did you ever go back and look at the amount of laser that was done by the doctors in your study to see if there was near confluent treatment in every eye that was treated?

A. Not in every eye, but in many eyes.

Q. All right. Did you go back and look at the 89 eyes that had retinal detachments and see if those doctors had done near confluent laser?

A. Did I go back and do it? No.

Q. And so as you sit here today, are you assuming that those 89 eyes went on to retinal detachment even though they got appropriate laser therapy?

A. Yes, I am.

Good's testimony does not show that the ETROP study has any probative force regarding the causal connection between the manner of performing laser surgery and the outcome. We can infer from his testimony that he looked at some of the surgical results, and in "many" eyes the laser was applied in a confluent manner, but it is unknown whether the laser was not applied confluently to other eyes in the majority cohort. And he testified that he did not examine the eyes that suffered retinal detachment, so it is possible that those

---

34. 328 S.W.3d at 536 (emphases added).

35. *Id.*

36. *Id.* at 537–38.

eyes were treated the way he testified they should have been treated and still suffered a bad outcome. Thus, the ETROP study has no probative value regarding the manner in which Llamas performed the surgery and the cause of Daniella's injuries.

Fourth, Good admitted that the ETROP study is not proper causation evidence as to negligent treatment delays—which means that the study is useless as to both acts of negligence alleged against Ponte and two of the three acts of negligence alleged against Llamas.

Finally, the ETROP study is just one study. The *Havner* court specifically declined to hold that a single epidemiological test is legally sufficient causation evidence.[37] Absent additional evidence demonstrating the probative value of the single ETROP study on the facts of this case, we follow the path marked by *Havner* and conclude the ETROP study is not legally sufficient evidence of causation.

*Jelinek* and *Havner* required appellees to provide a factual basis for comparing Daniella and the ETROP study participants. To say that the ETROP study shows that Daniella—with her specific additional risk factors—had about a 78% chance of a sighted life assumes that her situation is sufficiently similar to the study participants. However, the record provides no evidence supporting that assumption. Because the required evidence is missing, appellees did not provide the circumstantial causation evidence that *Jelinek* requires.[38]

## D. Conclusion

Appellees' causation evidence showed only that a different treatment plan could

have resulted in a different outcome for Daniella, which does not suffice to show but-for causation. To the limited extent appellees' experts purported to establish but-for causation, their testimony lacked factual explanation and support and was thus non-probative. Accordingly, appellees adduced legally insufficient proximate cause evidence against appellees Ponte and Llamas. The trial court erred by failing to grant appellants' motion for a take nothing judgment notwithstanding the verdict.

## III. DISPOSITION

For the foregoing reasons, we reverse the judgment of the trial court and render judgment that appellees take nothing from appellants.

Schenck, J., dissenting

## DAVID J. SCHENCK, JUSTICE, dissenting

The Court concludes in a thoughtful and comprehensive opinion that appellees offered no evidence of causation. I regret that I find myself unable to join it. Because I would hold that the record, viewed as a whole and in the light most favorable to the verdict, reflects at least some evidence of cause in fact, I respectfully dissent.

The Court clearly explains the applicable law. To establish cause in fact, the plaintiff must introduce evidence of a "reasonable medical probability" or a "reasonable probability" that her injury was caused by the defendant's negligence. As the Court explains, this standard

37. 953 S.W.2d at 718, 727.

38. The dissent's lymphoma hypothetical is unpersuasive because (1) it assumes the missing fact here—that the patient is like the study group; (2) it presents the same fact pattern

that the supreme court held was deficient in *Jelinek;* and (3) it, like our record, fails to show that the negligence more than doubled the risk of harm as *Havner* requires. *See Havner*, 953 S.W.2d at 717–18.

" 'mean[s] simply that it is "more likely than not" that the ultimate harm or condition' resulted from the defendant's negligence." *Ponte v. Bustamante*, No. 05–12–01394–CV, Opinion on Rehearing at 5 ("Opinion") (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex.2010)). Where I differ from the Court's analysis is in the application of this standard. I would not require (1) the plaintiff to prove that each defendant's negligence, standing alone, caused the injury; (2) the plaintiff to disprove all other possible causes of her injury, no matter how unlikely; or (3) proof to a medical certainty that absent defendants' negligence, Daniella would have a sighted life.

As all involved in the case appear to agree, baby Daniella was highly likely to develop ROP, a condition that without timely diagnosis and competent surgical intervention could cause her permanent vision loss.[1] With supporting record evidence that the defendants had failed to timely diagnose or initiate the necessary treatment, and that the surgery, when belatedly performed, was significantly mishandled, the jury found all defendants negligent. We leave the jury's implied findings of negligence in each of these respects undisturbed. Given the known risks to the patient, there is little room for debating the foreseeability prong of proximate cause here. With negligence and foreseeability established, only the question of but-for causation remains.[2]

The question of causation in fact—or "but-for" cause—is usually among the more simple and obvious problems associated with legal liability in tort. By itself, but-for causation is far-reaching. The most vivid illustration of the breadth of the concept may come from the nursery rhyme relating the loss of a kingdom for want of a nail.[3] It is precisely because of these far-reaching implications that literal but-for causation is not alone enough to establish legal liability. It is constrained by the additional requirement that the harm at issue be reasonably foreseeable as a consequence of the alleged misconduct.[4] Thus,

---

1. Dr. Ponte, the medical director of the neonatal intensive care unit ("NICU") that treated Daniella, testified that babies as premature as she was were 100% certain to develop ROP. He, together with Dr. Llamas, was responsible for establishing the examination schedule. Despite testimony reflecting the rapid progress of ROP and the need for surgical intervention within 48 or, perhaps, 72 hours of a determination of "threshold" ROP, Daniella went one month from her first examination to her second, at which point Dr. Llamas determined she required immediate laser surgery. Contrary to the published standards on which defendants rely, the NICU had no protocols requiring more prompt examination, despite the high risk of patients like Daniella developing ROP, and had no ready access to the laser needed to treat it.

2. Indeed, given the nature of the risk and the presence of negligence one might argue that a reasonable lay juror might directly infer the requisite factual causation—a notion we need not explore in this case given the admission of Dr. Good's expert causation testimony. While expert opinion evidence is necessary to establish the standard of care and breach in medical malpractice cases, it is not invariably necessary to establish factual causation, depending on the nature of the claimed injury. *Jelinek*, 328 S.W.2d at 533 (noting expert testimony is the norm). Of course, where qualified expert opinion is admitted as to both negligence and causation on the grounds that it is helpful to the fact finder and reliable, it is probative of the causation question as well, unless it amounts to a mere *ipse dixit* declaration. *Id.*

3. See, e.g., *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 329 (Tex.2008) ("want-of-a-nail" approach to causation "squarely rejected" in *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798–800 (Tex.2004)).

4. See generally *Union Pump Co. v. Albritton*, 898 S.W.2d 773, 777–78 (Tex.1995) (Cornyn,

liability in this and other cases in which negligence has been established turns on combining but-for causation and foreseeability in the requirement of proximate cause.

Fairly summarized, Dr. Good's extensive testimony, as supplemented by like testimony from Dr. Phelps, identified the negligence of each defendant and explained how it contributed to Daniella's blindness. The acts of negligence identified by the Court, and established by the evidence, were (1) failure to examine Daniella at all during a critical time period; (2) failure to perform laser treatment promptly after determining its necessity; and (3) negligent performance of the laser treatment itself. But the Court concludes that the expert testimony about these acts "does not suffice to show but-for causation" because it "lacked factual explanation and support" or was "conclusory." Opinion at 13, 24. In the Court's view, the plaintiffs failed to explain "how and why" these acts, undisputedly in violation of the standard of care, caused Daniella's blindness. *See, e.g.,* Opinion at 15 ("The question is whether Good explained how and why Llamas's three acts of negligence caused the injury."). The experts, in my view, answered these questions by providing specific evidence from Daniella's medical records, their own subsequent examination of her, and from their own expertise about the

progression and treatment of ROP in general and in Daniella's case in particular. They could not, of course, pinpoint exactly when Daniella developed ROP, testify to a date on which her ROP became treatable, or quantify exactly the actual delays. Because Daniella was not examined for four weeks, there is no medical record to consult to determine the status and progression of her ROP during this critical time period. But there was evidence from which the jury could have found that timely diagnosis and properly performed treatment would have, more likely than not, resulted in a sighted life for Daniella.

Dr. Good offered his opinions, quoted by the Court, that both the examination schedule and the laser treatment itself fell below the applicable standards of care, and that these failures were a proximate cause of Daniella's blindness. No witness disputed that prompt diagnosis and treatment of ROP was the accepted standard of care (as Dr. Ponte agreed, ROP should be "diagnosed as soon as it is diagnosable" and "treated as soon as it is treatable"),[5] or that Dr. Good had the requisite expertise in both treating patients and conducting research to draw reliable conclusions about the effect of these lapses from his review of Daniella's treatment. His opinions were that earlier examination and appropriate laser treatment would have prevented

J., concurring, quoting *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928)), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45–46 (Tex.2007).

**5.** Delay in diagnosis and treatment, such as the jury impliedly found here as to all defendants, can be a contributing cause leading to blindness in an ROP patient, as Drs. Good and Phelps opined below, and as Dr. Llamas has previously argued to this Court. *Llamas–Soforo v. Jimenez*, No. 05–09–00102–CV, 2009 WL 3366560, at *3 (Tex.App.–Dallas Oct. 21, 2009, pet. denied) (mem.op.) (dismissing Llamas's challenge to pre-trial expert opinion

attributing blindness in baby born at 23 weeks to Llamas's failure to apply laser treatment to affected portion of the eyes where Llamas urged such opinion was "conclusory" and suggested outcome was attributable to other physicians' delay in diagnosing and sending patient for surgery); *see also Gross v. Burt*, 149 S.W.3d 213, 236–41 (Tex.App.–Fort Worth 2004, pet. denied) (setting aside judgment against physician and hospital where patient first presented for treatment after pre-existing delay in diagnosis beyond 72–hour period where surgery is effective, because delay caused probability of surgical correction to drop below 50%).

Daniella's blindness. I do not believe that opinion to be *ipse dixit,* because Dr. Good explained the consequences of delay to the jury and because even the published standards on which defendants relied warned that delay alone can result in blindness.

In addition to Dr. Good's testimony, plaintiffs' expert Dr. Phelps testified that if Drs. Ponte and Llamas had timely examined Daniella in accordance with the standard of care, they "would have seen the ROP as it started up or as it became established and before it became advanced." If they had followed the standard of care, "more likely than not Daniella would have functional vision." Thus, the only evidence offered at trial by any party was that timely and competent examination and treatment are the standard of care, and blindness is the foreseeable result when the standard is not met. Daniella's experts then opined that Daniella is blind because she did not receive this timely and competent care.

Dr. Good also testified to his expert opinion that timely and competent "ROP laser therapy is effective in stopping the progression of ROP in most babies," with a 75% success rate "or higher," for "all comers." Dr. Good was responding to a question regarding a chapter in a treatise written by one of the defense experts, Dr. Graham Quinn. Also, as appellees urge on rehearing, the ETROP[6] study, showing timely laser therapy to have an overall success rate over 75%, "*is* legally sufficient evidence that performing the surgery properly would have resulted in a different outcome."

I would conclude on this record that there is nothing missing from this causal chain. The defendants knew Daniella's

risk of ROP was almost certain. They also knew that ROP could result in blindness, and that standards had been accepted by the medical community to prevent that result. Even at the time, defendants understood that timely examination, and treatment if necessary, prevented blindness. Yet Daniella's ROP was neither "diagnosed as soon as it was diagnosable" nor "treated as soon as it was treatable." In my view, the "how and why" is that defendants allowed Daniella's ROP to progress past the point where diagnosis and treatment, in her experts' opinion, should have been made and undertaken. When treatment was belatedly undertaken, it was improperly performed. Viewing the evidence in the light most favorable to the jury's verdict, and indulging every reasonable inference that would support it, *see City of Keller v. Wilson,* 168 S.W.3d 802, 820–22 (Tex.2005), Daniella would not be blind but for the (1) delay in diagnosis and treatment; (2) improperly performed treatment; or (3) both. In my view, the evidence supports any one of those three possible findings.

To be sure, had the laser therapy been performed without negligence, our causation inquiry would be simplified. Daniella's blindness could have been a product of only one of two causes: (1) delaying the diagnosis and laser treatment, for which there is ample evidence, or (2) she had no hope of recovery regardless of her treatment—a notion supported by no evidence and contrary to the opinion of two experts and the probabilities suggested by the objective data. The fact that the causation problem is further obscured by additional negligence in performing the surgery does not add to the victim's burden and would

**6.** As the Court explains, the Early Treatment for Retinopathy of Prematurity or ETROP study was conducted prior to 2003. Dr. Good was the chair of the ETROP study. Because

Dr. Good was the chair of the ETROP study, the jury may have found his testimony that defendants breached the applicable standards of care particularly credible.

not support rendition of a take-nothing judgment in the face of a verdict apportioning fault as this one did.

As the jury was instructed, there may be one or more causes of an event. If there were some evidence that delay in treatment alone [7] could not cause the harm complained of or contribute to the challenge in performing the laser treatment we would have something to weigh on the *City of Keller* scales. But the evidence here is entirely to the contrary: that regular, consistent examination of a child likely to develop ROP was essential to allow surgical

correction.[8] Under the earlier, more lenient standards on which the defendants claimed to rely, Daniella should have been re-examined within two, or at most, three weeks of the initial examination. When Dr. Llamas next saw her a month later, her right eye already had "zone 1" disease and was hemorrhaging, and both it and her left eye required immediate laser treatment. While the guidelines called for the NICU to publish the examination schedule, to trigger automatic visits to avoid missing a deadline and to allow sufficient time for treatment "including trans-

fer to another facility for treatment," the NICU had done none of this and could not locate a laser (or arrange a transfer), delaying the procedure until the early evening of August 4. On these facts, the jury might have attributed the cause of Daniella's blindness to the delay in the examination (including and especially as to her right eye), or to the further delay in performing the procedure (as to either eye), or to the negligence in the procedure itself.

In sum, Dr. Good explained how both Dr. Ponte and Dr. Llamas deviated from the applicable standards of care for babies at known risk for ROP, and further testified as to how these deviations were the proximate cause of Daniella's blindness. This is, therefore, not a case where a credentialed expert appeared at trial simply to declare the harm to be a product of misfeasance, leaving the basis for the conclusion a mystery or in conflict with his own testimony concerning other possible causes.

On rehearing, appellees cite *Merrill Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997), to support their contention that epidemiological data may

7. As the Court points out, Dr. Good agreed that the ETROP study was not designed to determine whether a delay in screening actually affected a baby's vision, and that it would be "an incorrect use" of the ETROP study to "claim that it was designed to detect or to look at the effect of delay." Opinion at 15–16. As Dr. Good explained, however, the result of the ETROP study was "that earlier treatment in high-risk babies had a beneficial effect compared to conventional management," including benefits in both structure (such as retinal detachment) and function (visual acuity). The earlier study on which defendants rely specifically warned that blindness could result from a delay in either diagnosis or treatment.

8. For example, during deliberations, the jury asked for a copy of the 2001 standards on which the defendants relied to establish the

standards of care at the time of Daniella's birth and treatment. The parties agreed to provide Court's Exhibit 3, guidelines developed jointly by the American Academy of Pediatrics, the American Association for Pediatric Ophthalmology and Strabismus, and the American Academy of Ophthalmology in 2001, which provided in part,

> Responsibility for examination and follow-up of infants at risk for ROP must be carefully defined by each neonatal intensive care unit.... If responsibility for arranging follow-up after discharge is delegated to the parents, it must be clearly understood by the parents *that blindness is a possible outcome, that there is a critical time window to be met if treatment is to be successful, and that timely follow-up examination is essential to successful treatment.* (Emphasis added.)

constitute legally sufficient evidence of causation. The Court instead relies on *Havner* to support its conclusion that the ETROP study is not probative regarding causation. Opinion at 20–24. In my view, *Havner*'s analysis of causation in strict liability cases embraces a standard that, if anything, is too liberal for professional negligence cases, and in any event has little to offer in this setting. *See Bostic v. Georgia–Pacific Co.*, 439 S.W.3d 332, 347–48 (Tex.2014) ("[w]e have never held that [*Havner*] applies universally to all tort cases where causation is an issue"). *Havner* addresses the use of epidemiological studies to establish causation where direct evidence of causation is lacking and permits recovery to all plaintiffs where the overall risk of a harm to the general population exposed to a defective product is doubled. *See Bostic*, 439 S.W.3d at 349–50 ("where direct evidence of causation is lacking, scientifically reliable evidence in the form of epidemiological studies showing that the defendant's product more than doubled the plaintiff's risk of injury appropriately corresponds to the legal standard of proof by a preponderance of the evidence"). In *Havner*, there was no direct evidence that the drug Benedictin caused the plaintiff's birth defects. *Havner*, 953 S.W.2d at 708–09. In addition to this issue of specific causation, *Havner* addressed the use of epidemiological studies to establish general causation, that is, whether Benedictin could cause birth defects in anyone. *See Bostic*, 439 S.W.3d at 347–48. In this case, Dr. Good did not rely on an epidemiological study to establish the probability that delayed or inadequate treatment of ROP would cause blindness in the general population, and opine that Daniella might be one of those cases. Instead, he testified that both Dr. Ponte and Dr. Llamas deviated from the applicable standards of care for babies at known risk for ROP, and these deviations were the proximate cause of Daniella's blindness. The fact that objective data supported that conclusion does not detract from its weight. This was not a case where an expert was simply attempting to surmise actual causation by extrapolating from a statistical possibility of general causation in a broader population.

Neither Dr. Good's failure to establish that Daniella's blindness was attributed solely to one of the multiple acts of negligence here, nor his failure to explain why Daniella would not have been among the minority of patients (22%) [9] who ultimately suffer blindness despite proper treatment renders his opinion empty *ipse dixit*. I would reject these additional burdens the Court imposes on a plaintiff to submit a negligence question to the jury.

Although it is no longer explicit in the Court's opinion that each defendant's negligence alone must be, more likely than not, a but-for cause of Daniella's injuries, the Court maintains its criticism of Dr. Good's testimony that "he predicated his opinion on the *combined negligence* of both Ponte and Llamas" in a sequence of events. Opinion at 12. But a defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing the injury about. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex.1992).[10] And there may be

---

9. The Court calculates this percentage from testimony at trial regarding the ETROP study. *See* Opinion at 16 n.23.

10. Where multiple negligent actors participate in an episode leading to a single injury, the common law responded with a variety of answers ranging from denying recovery, to shifting the burden to the defendants, to simply leaving all defendants fully and jointly liable for the injury. PROSSER & KEETON ON TORTS § 52 (5th ed.1984). The Texas Supreme Court settled on the latter approach. *Riley v. Indus. Fin. Serv. Co.*, 157 Tex. 306,

more than one proximate cause of an injury, as the jury was instructed here. *See, e.g., Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 774 (Tex.2010). As noted, Dr. Good and Dr. Phelps both testified as to how Dr. Ponte's negligence in relation to the delayed diagnosis contributed to Daniella's blindness. The evidence is that both doctors and the NICU, which Dr. Ponte led, collectively failed to establish a protocol adequate to timely diagnose critical-stage ROP and failed to timely diagnose it in Daniella, their patient. Likewise, the jury heard evidence that the procedure was delayed a further three days because the laser device could not be found. I would conclude that these acts of negligence, considered together, were shown to be a substantial factor in bringing about Daniella's injury. *See E–Z Mart Stores, Inc.,* 825 S.W.2d at 459; *Del Lago Partners, Inc.,* 307 S.W.3d at 774.[11]

The Court also imposes a burden on plaintiffs to affirmatively disprove all other potential causes of an injury, regardless of likelihood of occurrence, in order to establish that a defendant's negligence was more likely than not a cause in fact of an injury. *See* Opinion at 16–17 (Good "did not explain why he concluded Daniella would not have been among the 22% of babies who suffered blindness even after receiving proper laser treatment").

Having established the treating physician's negligence and the harm foreseeably relating to it, and having proffered competent expert opinion—augmented by objective data supporting it—that the negligence was the probable cause of the foreseeable harm, a patient does not bear the further burden of negating all other possible causes of an injury in order to raise a fact issue with respect to causation. *E–Z Mart Stores, Inc.,* 825 S.W.2d at 460–61. Under the Court's standard, in any medical negligence case, a plaintiff could not raise a fact question as to whether a reasonable degree of probability supports causation without first affirmatively disproving—no matter how unlikely—all other potential complications of the surgery or preexisting conditions of the plaintiff. The concern here is that this same standard applies universally across virtually

302 S.W.2d 652, 655–56 (1957), *overruled in part on other grounds, McMillen v. Klingensmith,* 467 S.W.2d 193, 197 (Tex.1971). Beginning in 1973, our Legislature developed a comprehensive scheme of percentage attribution that requires juries to apportion fault among all of the actors. Act of Mar. 22, 1973, 63rd Leg., R.S., ch. 28, 1973 Tex. Gen. Laws 41 ("Comparative Negligence–Contribution Among Joint Tort–Feasors"). While I concede that the negligence question as to Dr. Ponte is a closer one, the question of apportioning cause was properly resolved under Chapter 33 of the Civil Practice and Remedies Code.

**11.** As discussed in PROSSER & KEETON ON TORTS § 41, at 266–67 (5th ed.1984), "[i]f two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result," courts have applied the "substantial factor" test, that is, whether the defendant's conduct was "a material element and a substantial factor in bringing [the event] about." The authors note "[a]n interesting occasion for application of the same principle, where the negligence of each of two parties prevents the other from being a but-for cause," in which "A supplies B with a car with no brakes; B makes no attempt to apply the brakes; and C is hit. Or A fails to signal for a left turn; B is not looking; there is a collision, and C is injured." *Id.* at 267 n.27. In such a case, the conduct of each actor is a substantial factor in bringing the event about. *See id.* The Texas Supreme Court also considered the distinction between but-for cause and the substantial factor test in *Bostic. See Bostic,* 439 S.W.3d at 342–46 ("While but for causation is a core concept in tort law, it yields to the more general substantial factor causation in situations where proof of but for causation is not practically possible or such proof otherwise should not be required.").

every setting, including general negligence, intentional torts and arguably, criminal offenses in which injury is an element.[12] *See, e.g., Paroline v. United States,* —— U.S. ——, 134 S.Ct. 1710, 1719, 188 L.Ed.2d 714 (2014) (concept of proximate cause, including cause in fact and foreseeability, is applicable in both criminal and tort law). Suppose a father is timely diagnosed with a form of lymphoma having a 90% survival rate if diagnosed early and treated properly. Suppose further that a malicious heir wishing to advance his inheritance switches his parent's prescribed lymphoma medication for a placebo. In a resulting civil wrongful death case, would appellants have us dismiss as *ipse dixit* a medical expert's opinion that the switch more than likely caused the death, or direct a judgment of take nothing, absent proof from the expert establishing (1) why 10% of patients do not respond to the treatment and (2) why the decedent would not have been in the 10%? In a resulting criminal homicide case, would appellants advocate acquittal without similar proof? I would think that the expert's opinion, bolstered by the objective data, is some evidence of but-for causation and allow the defendant to meet that evidence to persuade a jury to the contrary.

While it was *possible* that Daniella would have been blind even with proper treatment, on this record, viewed as a whole, it is not probable. Rather, the opposite has been shown—not to a certainty perhaps, but certainly to a reasonable

degree of medical probability. The Supreme Court has set the probability bar at 50% in *Kramer. Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 400 (Tex. 1993). I would conclude that the plaintiffs have offered some evidence of causation by establishing the probability of a sighted life at 75% or higher, especially in the absence of record evidence suggesting any reason why Daniella's prospects were reduced.

The Court relies on *Jelinek* to impose these burdens in addition to proof of a reasonable medical probability that Daniella's injury was caused by appellants' negligence. I would conclude that this case is materially distinct from *Jelinek.* In *Jelinek,* a doctor testified that the plaintiff's pain was caused by the defendants' failure to treat her infection with a particular antibiotic. 328 S.W.3d at 535–37. But the doctor also admitted on cross-examination that the symptoms he cited were equally consistent with two other infections, later found in the plaintiff, for which the absent antibiotic would not have been effective. *Id.* at 535–36. According to the expert himself, the plaintiff's symptoms were just as likely to have been caused by something other than the defendants' negligence as by the negligence itself. On those facts it was impossible for the proof of negligence causation, including the expert's own opinion, to preponderate.

Absent equally likely causes, I do not think the *Jelinek* court would require an

---

12. *See, e.g.,* Tex. Penal Code Ann. § 6.04(a) (West 2011) (person is criminally responsible if result would not have occurred but for his conduct). The Legislature's definition clearly incorporates the notion of causation in fact. *See, e.g., Thompson v. State,* 93 S.W.3d 16, 21 (Tex.Crim.App.2001) (evidence sufficient to support murder conviction even though victim of gunshot wound also received negligent medical care). In *Thompson,* the court cited a lack of evidence "that any of the actions

taken in attempting to save [the victim's] life were clearly sufficient to kill her." *Id.* Under the standard of but-for causation urged by appellants in this case, however, the court in *Thompson* should have required the State to affirmatively prove that none of the actions taken by the victim's doctors "were clearly sufficient to kill her" before concluding that appellant's actions were the cause of the victim's death.

expert who has explained why and how an injury was caused by one or more acts of negligence to also explain why some unknown and unmentioned variable other than negligence was *not* the cause of an injury in order for his opinion to constitute "some evidence." There is no evidence to suggest that Daniella was destined to be blind or that she exhibited some objective characteristic that predicted that result. In effect, a plaintiff would be required to prove a medical certainty—that without negligence, treatment would always be successful–by proof that she did not suffer from any variable that *might* result in failure.

In my view, such a notion is contrary to settled Texas law. Quoting *Havner*, the court in *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 217–18 (Tex.2010), explained that "a medical causation expert need not disprove or discredit every possible cause other than the one espoused by him" unless "evidence presents other plausible causes of the injury or condition that could be negated." *Id.* (quoting *Havner*, 953 S.W.2d at 720) (internal quotation marks omitted). The court in *Bostic*, also citing *Havner*, described the application of this concept in asbestos-disease cases, explaining that "it properly stands for the proposition that, even in mesothelioma cases, liability cannot be imposed on every conceivable defendant whose product exposed the plaintiff to some unquantified amount of asbestos, without proof of something more." *Bostic*, 439 S.W.3d at 341. These cases, in my opinion, do not require

a plaintiff who has offered proof that the defendant's negligence more than likely caused her injury to also speculate about other possible unknown causes and then disprove them. As this Court has explained, "[t]he plaintiff need not exclude all possibilities; it is sufficient to prove that the greater probability is that the defendant's conduct, alone or in contribution with others, was the cause of the harm." *First Assembly of God, Inc. v. Tex. Utils. Elec. Co.*, 52 S.W.3d 482, 493 (Tex.App.–Dallas 2001, no pet.).

In *Kramer*, the court explained, "the ultimate standard of proof on the causation issue" in a medical malpractice case is "whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." 858 S.W.2d at 400. The court continued, "[t]he effect of these standards is to bar recovery where the defendant's negligence deprived the tort victim of only a 50% chance or less of avoiding the ultimate harm." *Id.* Proving that Daniella was *not* in the 22% (or fewer)[13] who ultimately suffer blindness despite proper treatment would require proof that she *was* in the 78% for all of whom the treatment was effective, that is, proof of a 100% certainty that treatment would be successful. And there was nothing in the record to suggest how proof of 100% certainty could be made.[14] Dr. Good's testimony established that there was no distinction between the 22% of

13. The Court also notes the possibility that some form of negligence might have been present among the 22% of cases in the ETROP study that experienced vision loss. That prospect suggests that the inevitability of Daniella's blindness—the speculation at the core of the Court's conclusion—is actually reduced.

14. If the state of medical science allowed a reconciliation between those who respond to timely and proper treatment and those who do not, there would be no one receiving treatment except those ordained to benefit from it. If Daniella had some discernable characteristic that put her in the 22%, one would expect that her treating physicians would have known of it as well, and avoided the pain and expense of surgery.

babies who suffered blindness and the 78% for whom laser treatment was effective; his opinion that laser therapy is effective in at least 75% of cases applied to "all comers," not just to babies who did not suffer from other complicating conditions. In contrast to *Kramer*'s standards, plaintiffs' recovery here is barred unless they prove, by ruling out all potentially adverse factors, that defendants' negligence deprived Daniella of medically-certain success, that is, 100% chance "of avoiding the ultimate harm." *See id.* I do not construe *Kramer* to be so exacting.

Here, Dr. Good did not testify regarding equally likely causes of Daniella's blindness. Instead, Dr. Good testified unequivocally that the delay in Daniella's screening evaluation, the delay in laser treatment, and the inadequate laser treatment "each contributed to the poor visual outcome that Daniella experienced." Dr. Good testified that "more likely than not," Daniella's blindness was caused by the negligence he and Dr. Phelps described, and cited the ETROP study showing a high success rate for properly treated patients to augment that conclusion. Under *Jelinek*, this testimony is sufficient to establish cause in fact. *See Jelinek*, 328 S.W.3d at 532–33. The notion that some ROP patients exposed to negligence might, based on their particular circumstances, have been more likely to fall into the 22% of patients destined to be blind

anyway is one that the defendants in such a case would want to develop in hopes of avoiding an adverse or directed verdict.[15] But where, as here, the record, viewed as a whole, reveals only negligence and a 78% probability of a sighted life for all patients treated without negligence, I cannot conclude that there is no evidence of causation in fact for Daniella's blindness.

## CONCLUSION

I would grant appellees' motion for rehearing and affirm the trial court's judgment.

---

15. While the record reveals that Daniella suffered from a variety of complicating conditions that occur in extremely premature babies, such as low birth weight, that prematurity is what put her and other similarly-situated patients at high risk of developing ROP. With no evidence to explain what percentage of the ETROP patients suffered from like complications or how, if at all, those complications might have moved the probability needle we are left with the evidence we have. As that evidence is more than nothing, I would leave the parties where they were below. Relatedly, if there was some aspect of Daniella's condition that would have placed her at an objectively increased risk of blindness (i.e., greater than 22% or, more importantly, 50%) despite timely diagnosis and treatment, one would assume that such a condition was also within the knowledge of her treating physicians who, one would expect, would have so informed her parents before exposing Daniella to the discomfort and expense of surgery despite the higher risk.